**ROSEBUD SIOUX TRIBE**

v.

**Hon. Richard KNEIP, Governor of the State of South Dakota, et al.**

**No. Civ. 72–3030.**

United States District Court,
D. South Dakota.

Feb. 6, 1974.

Richard A. Smith, Mark V. Meierhenry, Rosebud, S. D., for plaintiff.

C. J. Kelly, Asst. Atty. Gen., State of South Dakota, Pierre, S. D., William F. Day, Jr., Winner, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge.

The Rosebud Sioux Tribe has brought this declaratory judgment action pursuant to 28 U.S.C. § 2201 et seq. seeking declarations that three specific acts of Congress did not diminish the Rosebud Sioux Reservation or alter its boundaries from those defined in the act of March 2, 1889. The defendants, the State of South Dakota and the counties of Mellette, Lyman, Tripp and Gregory, assert that the three acts did diminish the Rosebud Reservation so that that reservation presently embraces only Todd County, South Dakota. Acting on this assertion, the defendants have been exercising both civil and criminal jurisdiction over members of the Rosebud Sioux Tribe within the counties of Mellette, Lyman, Tripp and Gregory. The plaintiff does not seek a declaration of the exact nature of the jurisdiction, or the exact rights and privileges that members of the Rosebud Sioux Tribe enjoy in the four counties in question. The plaintiffs do ask this Court to declare whether or not any of the three statutes in question operated to diminish the geographical territory over which the tribe is entitled to exercise jurisdiction.

In recent years there have been many cases with substantially similar questions presented to the state and federal courts. *See*, Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); City of New Town, N. D. v. United States, 454 F.2d 121 (8th Cir. 1972); United States ex rel. Condon v. Erickson, 478 F.2d 684 (8th Cir. 1973); United States ex rel. Feather v. Erickson, 489 F.2d 99 (8th Cir., filed Dec. 7, 1973); State of South Dakota v. Molash, 199 N.W.2d 591 (S.D.1972); State of South Dakota v. Williamson, 211 N. W.2d 182 (S.D.1973). It is conceded that a declaratory judgment is an appropriate remedy in this circumstance.

## PRELIMINARY STATEMENT

In 1868 the United States and the Great Sioux Nation agreed upon the establishment of the Great Sioux Indian Reservation. This treaty was ratified by Congress on February 16, 1869, (15 Stat. 635), and proclaimed by President Andrew Johnson on February 24, 1869. This reservation, as formed by the 1868 Treaty, encompassed all the present state of South Dakota west of the eastern bank of the Missouri River, including the four counties in question. However, the Great Sioux Reservation, as originally established, was diminished by a series of acts. An Act of March 2, 1889, (25 Stat. 888) reduced the Sioux lands to about half their former extent and explicitly restored the remainder to the public domain. This is conceded by the Tribe. In that act, the Rosebud Sioux Reservation was established and

contained the counties of Mellette, Tripp, Todd and part of Gregory and Lyman. The statutory description of the Rosebud Reservation was as follows:

"Commencing in the middle of the main channel of the Missouri River at the intersection of the south line of Brule County; thence down said middle of the main channel of said river to the intersection of the ninety-ninth degree of west longitude from Greenwich; thence due south to the forty-third parallel of latitude; thence west along said parallel to a point due south from the mouth of Black Pipe Creek; thence due north to the mouth of Black Pipe Creek; thence down White River to a point intersecting the west line of Gregory County extended north; thence south on said extended west line of Gregory County to the intersection of the south line of Brule County extended west; thence due east on said south line of Brule County extended to the point of beginning in the Missouri River, including entirely within said reservation all islands, if any, in said river."

In United States v. Celestine, 215 U.S. 278, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909) the Supreme Court of the United States said:

"When Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress."

The United States Eighth Circuit Court of Appeals has just recently set forth clear guidelines for district courts in determining jurisdictional questions relating to Indian reservations. The Court said in United States ex rel. Feather et al. v. Erickson, *supra,* the following:

"We have these guidelines: (1) Intent to abrogate treaty rights is not lightly imputed to Congress. Menominee Tribe of Indians v. United States, 391 U.S. 404, 413, [88 S.Ct. 1705, 20 L.Ed.2d 697] (1968); (2) Congress having once established a reservation, all tracts remain a part of that reservation until separated therefrom by Congress. United States v. Celestine, 215 U.S. 278, 285, [30 S.Ct. 93, 54 L. Ed. 195] (1909); Seymour v. Superintendent, 368 U.S. 351, 359, [82 S.Ct. 424, 7 L.Ed.2d 346] (1962). Indeed, Congressional intent to disestablish the reservation must be either expressed on the face of the Act or be clearly discernible from the 'surrounding circumstances and legislative history.' Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 2258, [37 L.Ed.2d 92] (1973); United States ex rel. Condon v. Erickson, 478 F.2d 684, 689 (CA8, 1973); (3) Opening an Indian reservation for settlement by homesteading is not necessarily inconsistent with its continued existence as a reservation. *Seymour, supra. See also Condon, supra;* City of New Town, North Dakota v. United States, 454 F.2d 121, 125 (CA8 1972); (4) The well-preserved general rule is that Indians are to be left free from state jurisdiction and control. McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S.Ct. 1257, [36 L.Ed.2d 129] (1973); *Condon, supra* at 689 of 478 F.2d and citations. Federal jurisdiction is preferred. *McClanahan, supra.* (489 F.2d at p. 101)

Certainly in construing treaties and statutes passed for the benefit of Indians and Indian tribes, courts must construe them liberally and wherever possible resolve any doubt in favor of the same. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930); Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 50 L.Ed. 941 (1912); Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918).

In regard to the three acts in question, it becomes the duty of this Court to examine those acts in relation to the guidelines set forth above to determine whether or not the Congress of the United States, in passing those acts, intended to diminish and extinguish the portions of the reservation covered in

those acts, or merely to open those portions of the reservation to homesteading, and to not affect the outer confines of the Rosebud Reservation thereby. The acts in question are as follows: April 23, 1904 (33 Stat. 254); March 2, 1907 (34 Stat. 1230); May 30, 1910 (36 Stat. 448). The issue has been extensively and excellently briefed by both sides. In addition, this very issue has been discussed at length in two law review articles. *See*, Comment, New Town, et al: The Future of an Illusion, 18 S.D.Law Rev. 85 (1973); Smith, New Town, et al: A Reply, 18 S.D.Law Rev. 327 (1973). This Court will consider the acts in the order of passage.

## 1904 ACT

### (Gregory County)

The operative language of the 1904 Act reads as follows:

"Article I. The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County, South Dakota, described more particularly as follows: . . ."

The 1904 Act originated in 1901. When the Rosebud Reservation was created by Congressional Act in 1889, § 12 of that Act read as follows:

"Section 12—That at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner, if in the opinion of the President it shall be for the best interest of said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which such reservation is held, of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe or Indians, which purchase shall not be complete until ratified by Congress: . . ." Act of March 2, 1889, § 12 (25 Stat. 888).

Pursuant to Section 12, an agreement was reached with the Rosebud Sioux Tribe in 1901 to cede the surplus, unallotted portion of the Reservation lying in Gregory County to the United States. However, the 1901 agreement itself was never ratified by Congress. The portion of Gregory County opened to non-Indian settlers was not approved by Congress until 1904. It is the plaintiffs' contention that this delay marked a departure point—a point at which the whole tenor of congressional reservation policy changed. It appears that the plaintiff concedes that the 1901 agreement would have worked a diminution of the reservation. The plaintiff quotes the following House Report in support of this contention:

"Both of these bills present a new idea in acquiring Indian lands, and if this bill should be enacted into law it will establish a new policy and be a departure from the policy that has long since prevailed in acquiring Indian lands, as heretofore it has been the practice and policy of the Government to purchase lands from the Indians and pay them therefor and then open the same to entry and settlement . . . This bill provides that the land shall be disposed of under the homestead laws by the settler paying therefor, and the proceeds paid to the Indians, and it is expressly provided by Section 6 of this bill that the United States shall in no manner be bound to purchase any portion of the land except the school sections, or dispose of the same except as provided, or to guarantee to find purchasers for said lands, it is expressly stated that the intention of the Act is that the United States shall act as trustee for the Indians in disposing of the lands and pay over the proceeds from the sale

therefore only as the same are received." H.R. 10418, 58th Cong., 2nd Sess., January 21, 1904, p. 2.

The plaintiff states in its brief:

"thus, it is clear that, although the Gregory County act does employ some language to the effect that the United States was purchasing a tract of land outright for a consideration with the tribe retaining no interest, this was not the case. Congress actually had just abandoned this policy in favor of a policy whereby the United States acted merely as trustee for the sale of lands for the Indians, with the proceeds of the lands being paid to the tribe only if and when actually received from the homesteaders, instead of the United States paying the Indians a lump sum immediately and then trying to find buyers to recover the purchase price. As Burke stated, the Gregory County Act would establish a new policy, the refinements of which had yet to be made." Plaintiff's brief, (hereinafter cited as PB), at p. 30.

It is, however, the defendant's position that this "new policy" related solely and only to the method of payment and that the purpose and effect of the 1904 Act was the same as the 1889 Act in that regard. That is, that the opening of that portion of the reservation worked a diminution of the outer confines of the reservation and extinguished the same, making the reservation smaller than it originally was.

The Congressional Record is replete with speeches, debates, reports and discussions which tend to support the theory that the time lapse between 1901 and 1904 was because of a change in policy relating to the method of purchasing the lands, rather than the effect that the purchase would have. At 35 Cong.Rec. 3187–88 (1902) is the following statement:

"Mr. Platt . . . it is true that several years ago, I think—in opening Indian reservations, we paid large and extravagant prices for the land to the Indians, upon the theory that the Government was going to be reimbursed for its expenditures by the settlers paying for the land which they settled upon, a sufficient sum to reimburse the Government. That went on for years, and everybody supposed that that was acceptable to the settlers. Then the settlers began to agitate that the Government should remit to them the obligation which they had incurred to pay for the land, and thereby reimburse the Government, and the history of this agitation, of course, is well known. The Government remitted about $35,000,000 which it had paid to the Indians and which the settlers agreed to repay to the Government by the passage of that free homes bill."

At 35 Cong.Rec. 4801–02, Mr. Platt continues the discussion:

"Now this particular agreement comes here to be ratified on a payment to the Indians of about $2.50 an acre for the surplus lands within their reservation which are under the agreement to be ceded to the United States and *become part of the public domain*. The Indians, in negotiating, said that was not a fair price for the land and they were worth a great deal more. But finally the negotiation was concluded. The agreement comes here. So far as the Senate considers it, it is an agreement to open a reservation—to pass ordinarily without any particular examination or any thought of the consequences to the government in the matter of expense. I will not go into history of the negotiations as to these lands, but the price paid or agreed to be paid to the Indians is $2.50 an acre for the entire acreage *which is to be brought under the public domain by cession to the United States*.

The bill proposes that the land thus acquired shall be opened to homestead settlement without requiring any payment for the land settled upon from the settler. My amendment proposes that the settler pay $2.50 an acre, being the same which the government has agreed to pay to the Indians, and

that thus the government shall be reimbursed for the amount expended for the purchase. . . ." (Emphasis added)

And at 35 Cong.Rec. 4807, the following statement is seen:

"Mr. Clapp . . . here is this reservation in South Dakota. Of course the senators from South Dakota can speak more specifically of the character of the reservation and its surroundings than I can; but because we have to pay the Indians a certain amount for that reservation, as a matter of progressive Indian policy, *for the purpose of separating the Indians and extinguishing the reservation* or for the purpose of meeting the advancing demands of civilization for the use of the lands, it does not follow that the land is primarily and inheritantly worth so much an acre." (Emphasis added)

And finally, after the original bill was, in fact, amended this discussion takes place in the House of Representatives:

"Mr. Burke . . . Mr. Speaker, this bill provides for the opening to settlement of 416,000 acres of land, now a portion of the Rosebud Reservation in South Dakota, being that portion of the reservation in Gregory County. In 1901 a treaty was entered into with the Rosebud Indians on the part of the United States, by which the Indians agreed to sell to the government this land for $2.50 per acre. That treaty was transmitted to Congress, *and because of the fact that it provided that the government should pay for the lands outright and then take the chance of the Treasury being reimbursed by disposition of lands to settlers,* it never got further than through the Committee on Indian Affairs, which unanimously reported it favorably. It was never given consideration in the House.

Toward the concluding days of the last session of Congress, a new bill was prepared, substantially as this bill now provides, and that bill provided that the lands should be ceded by the Indians to the government, disposed of to settlers under the provisions of the Homestead Law, the price to be fixed at $2.50 per acre, as was provided in the original treaty. That bill did not receive consideration in the last Congress because of lack of time, but during the summer that bill was submitted to this tribe of Indians for their acceptance and 48 more than a majority consented to accept the terms of that bill. This bill is substantially the same as the bill which I have just referred to, except that the Committee, in view of a suggestion made by the Commissioner of Indian Affairs, in which he said he has no objection to the passage of this bill, provided the Indians were insured of as much money as they would have received under the treaty, instead of fixing the price at $2.75, which was provided in the bill submitted to the Indians during the summer, fixed the price at $3.-00 per acre for all the lands taken within the first six months, and $2.50 for all lands taken thereafter.

It was thought by the Committee that this would certainly insure the Indians as much money as they would have received under the original treaty, and, in my judgment, it insures their receiving considerably more. There is no opposition to the passage of this measure so far as I know." 38 Cong.Rec. 1423 (1904). (Emphasis added)

It appears, then, that the 1904 Act, as finally passed, incorporates verbatim, the entire text of the 1901 agreement with the exception of the 1901 lump sum section (the 1901 appropriation provisions). It appears that the new policy was, in fact, merely a change in an appropriations matter and not a change in any substantive effect of the act in question. The extended discussions just quoted center on appropriations problems while assuming that the reservation would be extinguished and the land returned to the public domain. The Eighth Circuit Court of Appeals had oc-

casion to consider the effect of this change in policy in United States ex rel. Condon v. Erickson, 478 F.2d 684 (8th Cir. 1973). In *Condon,* the Court said:

"Appellee thinks it significant that the 1908 Act provided for the proceeds from the sale of the lands to be deposited into the Treasury of the United States and credited to the Indians as was the case in the 1906 (*Seymour*) and 1910 (*New Town*) Acts. This method contrasts with prior acts wherein payment for the land was made directly to the Indians. It has been aptly pointed out, however, that this was simply a new method utilized by a Congress that no longer favored purchasing Indian lands and providing them free of cost to settlers." 478 F.2d 684, 687.

This Court, then, is satisfied that the 1901 agreement and the 1904 Act, concerning Gregory County, were considered by the Congress of the United States to be one and the same with the exception of the appropriation (homestead) provision. The true issue is, however, what was the intention of Congress with regard to the boundaries of the reservation in the 1904 Act.

What was the intention then of Congress in this opening of the portion of the Rosebud Reservation in Gregory County? It is now clearly established that the opening of an Indian reservation is not necessarily inconsistent with the reservation remaining geographically as large as it once was. Seymour v. Superintendent, *supra*; Mattz v. Arnett, *supra*. Again, legislative history is helpful in relation to these acts. c. f. United States ex rel. Condon v. Erickson, 478 F.2d 684, 688 (8th Cir. 1973); *See,* Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).

*Congressional Statements*

There are many statements in the Congressional Record which tend to support the defendants' theory that the size of the Rosebud Reservation was, in fact, diminished by the 1904 Act. One quota-

tion, in a committee report, is enlightening:

"There is no question but what the Indians have no use for the land that is proposed to be ceded by this bill; that the tract is only a very small portion of the Rosebud Reservation, and is really only a corner of the reservation, which will be left compact and in a square tract, and a reservation about equal in size to the Pine Ridge Reservation in South Dakota." H.R. Rep.No.443, 58th Cong., 2nd Sess. (1904).

Clearly the report suggests that the size of the reservation will be changed. A quick glance at a map will show that Gregory County must be *removed* to provide a "square tract". A copy of a page containing such a map is appended herein as Appendix A. The map is originally found at Comment, New Town, et al.: The Future of an Illusion, 18 S.D.Law Rev. 85, 129 (1973).

In addition, the following discussion takes place at 35 Cong.Rec. 4807:

"Mr. Clapp . . . here is this reservation in South Dakota. Of course the senators from South Dakota can speak more specifically of the character of the reservation and its surroundings than I can; but because we have to pay the Indians a certain amount for that reservation, as a matter of progressive Indian policy, for the purpose of separating the Indians and *extinguishing* the reservation or for the purpose of meeting the advancing demands of civilization for the use of the lands, it does not follow that the land is primarily inherently worth so much an acre." (Emphasis added)

And again, in H.R.Rep.No.443, 58th Cong. 2nd Sess. at p. 4 (1904), the following quotation is made of testimony of the Commissioner of Indian Affairs in front of the House Committee on Indian Affairs:

"If you depend on the consent of the Indians as to the disposition of the lands where they have the fee to the

land, you will have difficulty in getting it and I think the decision in the Lone Wolf case, that Congress can do as it sees fit with the property of the Indians will enable you to dispose of the land without the consent of the Indians. If you wait for their consent in these matters, it will be fifty years before you can do away with the reservations."

The law review article cited immediately above contains an extensive discussion of this matter.

It is difficult to read the House and Senate debates and reports without coming to the conclusion that the 1904 Act was an attempt to "do away" with the Rosebud Reservation in Gregory County. That purpose simply seems to be an assumption upon which all actions were taken and statements premised. Other materials similarly lead to that conclusion, however.

*School Land Provision*

Upon this state's admission to the Union, South Dakota's enabling act provided that:

"Nor shall any lands embraced in Indian, military or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become part of, the public domain." Act of Feb. 22, 1889, § 10, 25 Stat. 676

The 1901 agreement did not contain a school lands provision. However, Senator Gamble from South Dakota proposed, and the Senate adopted a school lands provision in 1902. Senator Gamble explained to the Senate the reason for his amendment:

"Under the provisions of the enabling act authorizing the admission of the State of South Dakota into the Union, sections 16 and 36 in every township were reserved for school purposes. This provision did not apply to permanent Indian reservations, but became operative when the Indian title was

extinguished and the land restored to and became a part of the public domain. This would withdraw about 29,000 acres of these lands and would leave 387,000 acres to be opened to settlement and which would be affected by the proposed amendment." 35 Cong.Rec. 3187 (1902).

Here is an unequivocal statement and corresponding action by the Senate of the United States premised solely and only upon the fact that the title of the Indians was extinguished and the lands restored to the public domain. It is a strong indication by Congress that its intention was to diminish the size of the Rosebud Reservation. The amendment was adopted without discussion, again buttressing the impression that the diminution of the Rosebud Reservation was a premise upon which all members of Congress acted when enacting the various Indian acts.

And again, when the school lands provision was proposed in the House of Representatives and a Rep. Finley questioned the appropriation for those school lands, Congressman Burke, a member of the House Committee on Indian Affairs, and a South Dakotan, responded:

"I am glad that the gentleman has asked me that question. I would state that under the enabling act under which the State of South Dakota was admitted to the Union, it was provided that sections 16 and 36 in said state should be reserved for the use of the common schools of that state, and it further provided that as to the lands within an Indian reservation the portions of that grant would not become operative until the reservation was extinguished and the lands restored to the public domain. That enabling act was passed by Congress on the 22nd day of February, 1889. In March of that same year, Congress ratified a treaty with the Sioux Indians in South Dakota for the cession of something like ten or twelve million acres of land, and made an express appropriation, in accordance with that enabling act, to pay outright out of the

Treasury the money for sections 16 and 36 of that land at the price stipulated for in the Treaty. Mr. Finley . . . 'Then as I understand the gentleman, he bases the wisdom or equity for this provision upon the enabling act admitting South Dakota into the Union. Mr. Burke, 'Yes', Mr. Finley, "and not otherwise?' Mr. Burke, 'no'." 38 Cong.Rec. 1423 (1904).

The plaintiff herein makes reference to a statute (43 U.S.C.A. § 865) which provides for the granting of school lands in opened reservations that are not restored to the public domain. This statute is not in point for it allows the state to *select* lands for school purposes *prior* to the opening of such reservation. However, the 1904 Act specifically referred to sections 16 and 36 in its granting of school lands and its legislative history indicates it was done in response to South Dakota's enabling act. This Court feels that 43 U.S.C.A. § 865, in fact, lends weight to the argument that the express grant of school lands in the 1904 Act bolsters its position. Had Congress merely been "opening" the reservation for settlement, it could have used 43 U.S.C.A. § 865 to supply the state of South Dakota with school lands. This method was not used, however.

The school lands provision stands as a clear indication of congressional intent to restore Gregory County to the public domain. *See,* United States ex rel. Condon v. Erickson, 478 F.2d 684, 686 (8th Cir. 1973). Other congressional enactments express the same intention, however.

*Subsequent Enactments*

In 1905 Congress passed an act to extend the time in which settlers could establish their residence in Gregory County under the homestead acts. As will be seen in the following quotations, there is a clear expression from Congress therein that Gregory County had ceased to be considered in the "congressional mind" as reservation or "Indian land". In Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973), the Supreme Court discussed subsequent legislation to bolster its opinion that the reservation at issue therein had not been extinguished. In Senate Report No. 2760, 58th Cong., 3rd Sess., p. 1 (1905), the following appears:

"The Committee on Public Lands, to whom was referred the bill to provide for the extension of time within which homestead settlers may establish their residence upon certain lands which were *heretofore a part of the Rosebud Reservation,* within the limits of Gregory County, South Dakota, having had the same under consideration, beg leave to report the bill back with the recommendation that it be amended, and that as amended it do pass." (Emphasis added)

Senator Gamble, in remarks before the Senate, found at 39 Cong.Rec. 1578 (1905), said the following:

"I ask unanimous consent for the present consideration of the bill to provide for the extension of time within which homestead settlers may establish their reservation upon certain lands which *were heretofore a part of the Rosebud Indian Reservation within the limits of Gregory County, South Dakota* . . ." (Emphasis added)

The operative language of the Act of February 7, 1905, ch. 545, 33 Stat. 700 is as follows:

"An act to provide for the extension of time within which homestead settlers may establish their residence upon certain lands which *were heretofore a part of the Rosebud Indian Reservation within the limits of Gregory County.* . . ." (Emphasis added)

Here then, is another clear indication that the Congress of the United States considered the reservation nature of Gregory County extinguished. Congress, in its act, had referred to this land as heretofore a part of the reservation.

*Conclusion*

This Court is of the opinion that the contemporary history of the 1904 Act

indicates a congressional intent to extinguish that portion of the reservation. The defendant's brief reveals several contemporary documents and sources that buttress this opinion. At no time can this Court find an express discussion of state versus federal jurisdiction over the lands in question. However, the whole tenor of the discussion in Congress convinces this Court that the purpose was to "do away" with the reservation in this area. This Court is convinced that the only interest that the Rosebud Sioux Tribe retained in the Gregory County lands was to be in the proceeds from the sale of those lands. There was never any question in anyone's mind but that the lands would be sold. At this time the demand for land for settlers was great.

The case of Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L. Ed. 507 (1920) is not in point. The act in question therein contains several provisions which the 1904 Act does not. *Ash Sheep* itself recognized that each treaty must be judged by itself.

That being the case, it is this Court's judgment that the confines of the Rosebud Sioux Reservation were diminished by the 1904 Act and the reservation or Indian land nature was extinguished therein, and Gregory County restored to the public domain.

### 1907 ACT

#### *(Tripp and Lyman Counties)*

On March 12, 1907 Congress passed an act concerning Tripp County and a portion of Lyman County. Each treaty or act must be analyzed separately to determine congressional intent. *See,* United States v. Ash Sheep Company, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920); Kills Plenty et al. v. United States, 133 F.2d 292, 295 (8th Cir. 1943).

The operative language of the 1907 Act is as follows:

"Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled, that the Secretary of the Interior be and is hereby, authorized and directed, as hereinafter provided, to sell or dispose of all that portion of the Rosebud Indian Reservation in South Dakota lying south of the Big White River and east of Range twenty-five West of the sixth principal meridian, except such portions thereof as have been, or may hereafter be, allotted to Indians . . . ."

Again, this Court should examine the history of the 1907 Act to determine congressional intent.

#### *Negotiations*

In 1906 Inspector James McLaughlin conducted negotiations with the Rosebud Sioux Indians for the cession of their unallotted lands in Tripp and Lyman Counties. Inspector McLaughlin was the very person who conducted the negotiations for the 1901 agreement and the 1904 Act. It is interesting to note that the transcript of their discussion adds weight to this Court's conclusion that the 1904 Act diminished and extinguished the Rosebud Reservation. The following quotation is found on page 5 of the hearing transcript held at the Rosebud Agency in 1906:

"Inspector McLaughlin . . . . There is no railroad running over any portion of the Rosebud Reservation, none within the boundaries of your reservation. That railroad in Gregory County has not yet come across your reservation boundary, but should it come into your reservation, you would receive pay for its right of way. Any of the Indians who may live in Gregory County whose allotments have been crossed by that railroad, have, or will receive pay for the privilege of crossing their allotments. So you need not worry about that, my friends." Dec. 14, 1906, Rosebud Agency Hearing by James McLaughlin, U. S. Indian Inspector, page 5.

It appears then that Inspector McLaughlin's assumption was that Gregory County was no longer a part of the Rosebud Sioux Reservation.

The Indian people during the negotiations expressed concern for the need of their land. Statements made by various Indians again buttressed this Court's opinion that the 1904 Act, in fact, diminished the reservation. A prime example is the following quotation:

"High Pipe: . . . . My friends, our Gregory County payment lasts two years yet. We all know that. The best land we have is in the eastern part of our reservation, Tripp County. The Indian people want to get land for their children there. They are very anxious to get land for their children down there." *Rosebud Hearing*, 1906, *supra*, page 8.

So it can be seen that the Indian members at this time recognized Tripp County as the eastern portion of their reservation. Gregory County does, of course, lie east of Tripp County. *See* map appended to this opinion. It is difficult for one to read the transcript of the negotiations in 1906 without feeling that this was merely a continuation of the original negotiation in 1901 which culminated in the Gregory County act, the 1904 Act, discussed above. That plainly is the import of all the discussion held therein. Chief Picket Pin, after discussing the Great Father's need for land said: "My friend, you are going home this time without any land." *Rosebud Hearing*, 1906, *supra*, page 7. The 1907 Act was clearly a continuation of the policies followed in the past. Not only the transcript of the negotiations for the 1907 Act indicate this conclusion, but the congressional history as well.

*Congressional History*

There are many statements contained in the Congressional Record and various congressional reports which indicate an intent by Congress to diminish the confines of the Rosebud Reservation yet another time. As stated in H.R.Rep.No. 7613, 59th Cong., 2nd Sess. p. 1 (1907):

"The purpose of this bill is to authorize the opening and sale of that portion of the Rosebud Reservation in South Dakota known as Tripp County, and it affects all that portion of the reservation east of Range 25 of the 5th Principal Meridian south of the Big White River and embraces about one million acres.

In the second session of the 58th Congress a law was passed authorizing a sale of so much of this same reservation as was located in Gregory County, the tract affected being about one-half the area embraced in the tract affected by the pending bill and lying immediately adjoining and east of Tripp County."

The exact same statement may be found in S.Rep.No.6838, 59th Cong., 2nd Sess., p. 1 (1907). In addition, Congressman Burke stated on February 16, 1907, the following:

"Mr. Burke from South Dakota . . . . Mr. Speaker, the bill has the unanimous report of the Committee on Indian Affairs, in which committee it was very carefully considered. The bill is substantially in accordance with an agreement which has just been made with the Indians, signed by 42 more than a majority of the male Indians over the age of 18 years. It is in line with recent bills that have been passed affecting the sale of Indian Reservations. . . . The Indians, as I have stated before, have agreed to the disposition of it under the terms of the bill. *They will have left, after this land is disposed of, a reservation that is substantially fifty miles square,* and there are only 5,000 Indians." 50 Cong.Rec. 3104 (1907). (Emphasis added)

It can be seen, upon examining a map, that the quotation "fifty miles square" referred to in the quote relates approximately to the size of the reservation minus Gregory, Tripp and Lyman Counties. Mellette and Todd County make up a generally square area, roughly fifty miles on a side. Again, one can see the continuous policy with relation to the Rosebud Indian Reservation in opening the reservation, diminishing the reserva-

tion, and extinguishing the reservation nature of the lands concerned.

### School Lands

Again, in the 1907 Act, the act makes provision for school lands as did the 1904 Act. The congressional committee reports state that the school land provision contained in the 1907 Act is for the same reason that the school land provisions were included in the 1904 Act already referred to and discussed above. The following report can be found at H. R.Rep.No.7613, 59th Cong., 2nd Sess., pp. 3–4 (1907), and S.Rep.No.6838, 59th Cong., 2nd Sess., p. 3, (1907):

"Section 6 of the bill reserves sections 16 and 36 in each township for the use of common schools, and grants the same to the State of South Dakota. And section 7 makes an appropriation to pay for the same at $2.50 per acre. This is following the precedents which have heretofore been established in the opening of other reservations in South Dakota, and is based upon section 10 of the Act of Congress admitting South Dakota into the Union, approved February 22, 1889. Said section is as follows:

'Sec. 10. That upon admission of each of said states into the Union, sections 16 and 36 in every township of said proposed states, and where such sections, or any portion thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, or other lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said states for the support of common schools, such indemnity lands to be selected within said states in such manner as the legislature may provide, with the approval of the Secretary of the Interior: provided that the 16th and 36th sections embraced in permanent reservations for national purposes shall not at any time be subject to grants

nor indemnity provisions of this act, nor shall any lands embraced in Indian, military or other reservations of any character be subject to the grants or the indemnity provisions of this act until the reservation shall have been extinguished and such lands restored to and become a part of the public domain.' "

Here again in the 1907 Act we have both the House and Senate reports on the bill referring specifically to the extinction of the reservation and the restoration of those lands to the public domain. This is a clear indication of congressional intent.

### Allotments

In the case of Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) the Court discussed the allotment provisions of the treaties involved. The Court in *Mattz* said:

"The presence of allotment provisions in the 1892 Act cannot be interpreted to mean that the reservation was to be terminated. This is apparent from the very language of 18 U.S.C. § 1151, defining Indian country notwithstanding the issuance of any patent therein." 412 U.S. 481, 504, 93 S.Ct. 2245, 2257, 37 L.Ed.2d 92.

There are allotment provisions in the 1907 Act. In Section 2 the following was stated:

" . . . provided, that prior to said proclamation the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the Rosebud Reservation to relinquish such allotment and to receive in lieu thereof an allotment anywhere within said reservation. . . ."

The clear import of that section is that the Indians in the portion soon to be opened, were allowed to relinquish that part of the reservation and remove to the diminished portion of the reservation. The 1910 Act, to be discussed hereinafter, made that alternative explicit. It is clear that after that portion of the reservation had been opened, the land would be disposed of under the gen-

eral homestead and townsite provisions and laws and that there would be from that time after no further allotments made in this area. The allotment provisions provided for or discussed in *Mattz* are as follows:

> "Provided, That any Indian now located upon said reservation may, at any time within one year from the passage of this act, apply to the Secretary of the Interior for an allotment . . . . and the Secretary of the Interior may reserve from settlement, entry, or purchase any tract or tracts of land upon which any village or settlement of Indians is now located, and may set apart the same for the permanent use and occupation of said village or settlement of Indians . . . ." *See,* 412 U.S. 481, 495, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92.

It is clear from that quotation that the act in question contemplated a continuing presence or at least the option to the Secretary of the Interior to declare a continuing presence of reservation in the area opened. No such provision is made in the 1907 Act herein. In fact, the import of the act contemplates no such continuing area that may be "set apart . . . for the permanent use and occupation . . ." of the Indian. The allotment section in the 1907 Act merely allows the Indians the option to keep the allotment that they then had or give up that allotment and remove to some other portion of the reservation *prior* to the proclamation of the Act. *See,* Sec. 2, Act of March 2, 1907. As can be seen from page 17 of the transcript of the hearing conducted by the Inspector McLaughlin with the Indians concerning the 1907 Act, the allotment provisions contained therein are to assure that all Indians within the Rosebud Reservation who had not before been allotted lands would receive such lands before such time as the settlers were allowed to homestead in the area. *See* Dec. 14, 1906, Rosebud Agency Hearing by James McLaughlin, U. S. Indian Inspector, p. 17. There is no provision

in the 1907 Act for continuing allotment provisions.

*Subsequent Enactments*

And again, subsequent laws enacted by Congress refer to Tripp County as "formerly within the Rosebud Reservation." *See,* Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). The Act of January 11, 1915, 38 Stat. 792, is such an act:

> "An Act Providing for the purchase and disposal of certain lands containing the minerals kaolin, kaolinite, fuller's earth, china clay, and ball clay, in Tripp County, *formerly a part of the Rosebud Indian Reservation* in South Dakota.

> "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all lands containing the minerals known as kaolin, kaolinite, fuller's earth, china clay and ball clay, in Tripp County *in what was formerly within the Rosebud Indian Reservation in South Dakota,* and has heretofore been opened to settlement and entry under Acts of Congress which did not authorize the disposal of such minerals. . . ." (Emphasis added)

Here then, is a subsequent act of Congress which specifically refers to Tripp County as having been separated from the Rosebud Reservation. It is a clear indication of the intent of Congress. Again, in the Act of August 17, 1911, Ch. 22, 37 Stat. 21, the language is as follows:

> "Be it enacted . . . that any person who has heretofore made a homestead entry for land in what was formerly a part of the Rosebud Indian Reservation, in the State of South Dakota, authorized by Act approved March second, nineteen hundred and seven. . . ."

The above must be taken as a clear indication of congressional intent with regard to the extinction of the reservation nature of the lands in Tripp County.

Really no clearer indication could be asked for than acts of Congress which refer to the 1907 Act and to Tripp County as formerly within the confines of the Rosebud Reservation.

The defendants' brief contains numerous citations to other letters and reports of various government officials and agencies which constantly refer to the Tripp County section of the Rosebud Reservation as having been separated from the reservation, or having been formerly within the reservation. These contemporary documents must lend credence to the defendant's argument that it was, in fact, the intent of Congress to diminish the Rosebud Reservation once again by means of the 1907 Act. Again, the whole tenor of the contemporary documents seem to suggest to this Court that it was, in fact, the intent of Congress to diminish the Rosebud Reservation. The transcripts of the hearings held in 1906 and 1907 by Inspector McLaughlin constantly refer to the Gregory County Act and that taking in the same vein as the taking in 1907 by the Tripp County Act. There seems to have been no question to the participants in those conferences but that the land would no longer be considered reservation land. There is the reference in the hearing transcript to Tripp County being the eastern section of the reservation and that this eastern section would then be taken. The congressional debates once again seem to simply assume and have as their underlying premise that the separation and opening of Tripp County would work a diminution of the reservation. This Court is of the opinion that the surrounding circumstances, the congressional history and the contemporary documents of the 1907 Act clearly indicate the intention of Congress to diminish the Rosebud Reservation and extinguish the reservation nature of those lands in Tripp and Lyman Counties.

### 1910 ACT

#### (Mellette County)

Again, in 1910 Congress turned its eye to the Rosebud Reservation. Again the pressures for land for settlers were great, not only from the South Dakotans, but from people from the east who wished to move west. The response to this pressure was yet another bill to open the Rosebud Reservation for homestead settlement. The operative language of the 1910 Act is as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Interior be and he is hereby, authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Rosebud Indian Reservation, in the State of South Dakota, lying and being within the counties of Mellette and Washabaugh, . . ."

Again, this Court must examine the Congressional Record and other contemporary history of the passing of the 1910 Act to determine the intent of Congress with respect to that act.

### Congressional Statements

In January of 1910, Senator Crawford, discussing the Rosebud Reservation, made the following statement in the Congress of the United States:

"Mr. Crawford . . . By treaties negotiated from time to time, and by laws enacted from time to time, the area of lands occupied by the Indians has gradually narrowed to smaller and smaller limits until now the lands owned by the Indians are comparatively small in quantity. They are not lands which in their possession bring any revenue whatever. They do not cultivate them. They neither fish nor game upon them. The policy of the government toward the Indians and toward these lands has changed in more recent years simply in this respect—that the land be sold and the proceeds be made into a trust fund, the principle forever held inviolate and the income from which is devoted to the Indians . . . ." 45 Cong. Rec. 1068 (1910).

By this statement one can see the indication that Congress considered the

openings in the three acts discussed so far to be a continuous process of narrowing the range upon which the Indians would roam and "civilizing" that part of the western United States. The statement above stands mainly for the proposition that each of the acts must be viewed in light of the other.

In Senate Report No. 887, 60th Cong., 2nd Sess., pp. 1–2 (1909), the following report is made to the Senate of the United States concerning what was to become the 1910 Act:

"The present area of the Rosebud Indian Reservation aggregates 1,800,000 acres. The land proposed to be opened to settlement under the provisions of this bill embrace an area of about 900,000 acres. . . . It was at first contemplated to submit this bill, through an Indian inspector, for the consideration of the Rosebud Indians, but the Inspector, who for a number of years has had that especial work in charge, is otherwise occupied and has been unable to take it up and it is felt by the Committee that the provisions of the bill are fair and just to the Indians in all respects, and it would delay the consideration of the matter unduly if the action were withheld for that purpose and the measure could not receive consideration during the present session of Congress.

"The reservation is yet large, and in the judgment of your Committee the surplus and unallotted lands are unnecessary for the use of the Indians . . . . It also provides that the Secretary of the Interior, in his discretion, may permit Indians who have an allotment *within the area proposed to be opened to relinquish such allotment and receive in lieu thereof allotments anywhere within the reservation proposed to be diminished.*" (Emphasis added).

And in a report in the House of Representatives, H.R.Rep.No.429, 61st Cong., 2nd Sess. p. 2, (1910), the following statements are made:

"The Rosebud Indian Reservation when set aside as a separate reservation under the Sioux Act of 1889, contained something over 3,000,000 acres of land. In 1904 the unused and unallotted portion of the reservation in Gregory County, about 500,000 acres, was disposed of and the Indians received therefrom something more than $1,500,000. In the 59th Congress a law was enacted authorizing the sale of the unused and unallotted lands in that portion of the reservation in Tripp County, comprising about 1,000,000 acres, under a bill substantially in the same form as the bill now under consideration, except that the price of the land was fixed in the law, whereas under this bill the price is to be fixed by appraisement. . . .

"The area comprised in the present bill is about 800,000 acres and the proceeds from the sale thereof, under the terms of the bill, will probably amount to $3,000,000. *There will still be left a reservation containing 1,000,000 acres,* and as the Indians have all been allotted, there is no occasion for continuing a reservation larger than it will be when Mellette County is disposed of." (Emphasis added).

Here, perhaps, is the strongest statement yet in a House of Representatives committee report concerning each of the acts in question, in this Court's opinion. The committee starts by saying that the reservation was once 3,000,000 acres of land and finishes by saying that after the passage of the 1910 Act the reservation would contain only 1,000,000 acres. The report says that there is no need for a continuing of a reservation larger than the one that will result after the opening and disposal of the land in Mellette County. There can be little question from reading this House Report but that the House of Representatives contemplated a diminished reservation by not only the 1910 Act, but the acts passed in 1904 and 1907 as well. In addition, Mr. Burke from South Dakota made the following statement during the debates on the 1910 Act:

"I might say, Mr. Speaker, that there are two propositions to be considered

in disposing of the unallotted and unused lands on Indian reservations. One is at the earliest possible date, to get among the Indians, the white men and have those lands that are of no benefit to anyone that are lying idle, doing no good, opened up and developed into farms, and I believe that the placing through what were heretofore reservations, actual settlers, will have the effect of civilizing the Indians who will have allotments and also give value to those allotments which at present are of little value." 45 Cong. Rec. 5457 (1910)

*School Lands*

Again, the 1910 Act provides for school lands as did the 1904 and 1907 Acts. The Senate Report No. 887, 60th Cong., 2nd Sess., p. 2 (1909) provides:

"Section 16 and 36 of the lands in each township are not to be disposed of, but are reserved for the use of the common schools of the state, and these lands are to be paid for by the government in conformity with the provisions of the act admitting the State of South Dakota into the Union."

H.R.Rep.No.429, 61st Cong., 2nd Sess., p. 2 (1910), states almost the identical language in its report to the House concerning the bill. This Court has discussed in the sections on the 1904 and 1907 Act what it feels the import of the school lands provision is. Certainly the enabling act which admitted South Dakota to the Union discussing the disestablishing of the reservation and its return to the public domain must be a strong indication of congressional intent in this regard.

*Intoxicants*

Section 10 of the 1910 Act prohibits the introduction of intoxicants into the lands concerned with in this act. There is no dispute but that at this time there were federal laws prohibiting the introduction of all forms of intoxicants into "Indian country". The plaintiff would attach to this provision the congressional intent to continue the lands in Mel-

lette County as Indian lands. This Court thinks, on the contrary, that the limiting of the prohibition of intoxicants to 25 years, clearly indicates an intent of Congress that this was not to be considered henceforth Indian land. Evidently Congress felt that it must provide a special section to prohibit such intoxicants for a period of time to protect the Indians who still had allotted lands in that area. If Mellette County continued to be "Indian land", why would Congress feel the need to enact a specific act continuing the liquor prohibition, but only continuing it for a period of years? An eminent scholar on Indian law has the answer to that question:

"In connection with the power to regulate commerce with the Indian tribes there exists also the authority granted by the Constitution to do all things necessary and proper by way of carrying out its provisions. Pursuant to this power and the power over the territory and other property belonging to the United States, the federal government has imposed liquor restrictions on land ceded to it by the Indians when these lands adjoined Indian country. The purpose of this measure was to prevent sale of liquor on the boundaries of the land retained by the Indians. Except for these extensions of the liquor laws into 'buffer' areas the states would have had the exclusive police power thereon. Such extensions have been repeatedly upheld by the Supreme Court." F. Cohen, Handbook of Federal Indian Law, (University of New Mexico Press), p. 353 (1942 ed).

An interesting and enlightening discussion concerning the liquor provisions is found at 45 Cong.Rec. 5463–64 (1910):

"Mr. Goebel. . . . I am opposed to attaching to the sale of any reservation, conditions such as are proposed in this bill. Mr. Gronna. . . . Does the gentleman believe it would be safer on a reservation where liquors are permitted to be sold? Would the gentleman not buy land on a reservation where protection is given by the

government, even if such reservation is located in a prohibition state?

Mr. Goebel . . . . Oh, I do not know what I would do. At present I want to get the land without any conditions attached. *You must also bear in mind that when the lands are sold, there is no longer a reservation and the laws of the state apply.* . . .

Mr. Butler. . . . If the land is sold it will be no longer an Indian reservation. It is where, as I understand, the Indian has always lived and where he is going to live, and I believe in keeping the sale of liquor out of his neighborhood, and for that purpose I propose in a kind and gentle way to suggest to gentlemen that if there is to be an attempt made to prevent a restraint being imposed upon this title, they had better have a quorum of the House present to insure the success of the attempt." (Emphasis added).

Clearly this discussion indicates that the participants did not feel that the lands to be ceded and opened were reservation but that the liquor prohibition should be continued and remain so that the Indians who had an allotment in Mellette County would not be exposed to or affected by or tempted by "demon rum". It is this Court's opinion that the Indian agency and Indian schools provided for in Section 1 of the 1910 Act also fit within this rationale. Congress knew that various members of the Rosebud Sioux Tribe had taken allotments in the lands soon to be ceded, and these provisions attempted to continue to provide for those people in that area, although the land would no longer be considered as reservation.

*Allotments*

This Court has discussed, in relation to the allotment sections of the 1907 Act, the United States Supreme Court's recent opinion in the case of Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L. Ed.2d 92 (1973). In the *Mattz* opinion the Supreme Court made reference to the continuing nature of the allotment provisions to buttress its opinion that the Congress of the United States had no intention to extinguish the reservation nature of the lands involved. The 1910 Act which we are concerned with herein, also has certain allotment provisions contained in it.

"Provided, That any Indians to whom allotments have been made on the tract to be ceded may, in case they elect to do so before said lands are offered for sale, relinquish same and select allotments in lieu thereof on the *diminished reservation*:" (Emphasis added.)

This allotment section is addressed in Senate Report No. 887, 60th Cong., 2nd Sess., p. 2 (1909):

"It also provides that the Secretary of the Interior in his discretion, may permit Indians who have an allotment within the area proposed to be opened to relinquish such allotments and receive in lieu thereof allotments anywhere within the reservation proposed to be diminished."

This whole concept seems to be contrary to the concept that Mellette County continued as reservation land. In fact, in this Court's opinion, this allotment section provides the strongest indication yet that the area in question was no longer to be considered "Indian land". Congress, in effect, offered to allow Indians to exchange and take their allotments in what would continue to be Indian land so that they might continue to benefit from all of the programs that the government had on the reservation. They need not retain their allotment in what was no longer to be considered a reservation. Clearly there is no other reasonable explanation for such a provision.

*Subsequent Enactments*

As with the other acts described herein, subsequent acts of Congress lend credence and buttress this Court's opinion as to the effect of the 1910 Act. The

Act of March 3, 1919, 40 Stat. 1320, provided as follows:

> "The Secretary of the Interior is hereby authorized to sell and convey to the White River Cemetary Company, for cemetary purposes, for a price not less than the appraised value thereof, a ten-acre tract within the former Rosebud Indian Reservation in Mellette County, South Dakota, described as the northeast quarter of the southeast quarter of the northeast quarter of section thirty-four, township forty-two north, range twenty-nine west, sixth Principal Meridian, or such part thereof as may be required:"

Again, this is an indication that Congress regarded Mellette County as having been separated from the Rosebud Reservation and restored to the public domain. *See*, Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).

*Conclusion*

Again, the defendant cited to this Court reports and letters from various government bodies, officials and interested people which tend to confirm this Court's opinion that Mellette County was intended to be severed from the reservation and returned to the public domain. The school lands section, the intoxicants section, the allotments section all lend credence to this Court's opinion. This Court feels that the clearest indication yet of the congressional intent to diminish the Rosebud Reservation is expressed in the 1910 Act and the congressional history surrounding that act. It is clear from the congressional history that Congress viewed the 1904, the 1907 and the 1910 Acts as one continuous program of reducing the size of the various Indian reservations in the State of South Dakota so that settlers from the east could come in and acquire the land they so hungered for and so that the Indian people of South Dakota would become "more civilized". There is no doubt in this Court's mind, after having reviewed the contemporary documents

from the passage of the 1910 Act, and the congressional history thereof, that the Congress of the United States had the intention of diminishing the Rosebud Reservation and restoring Mellette County to the public domain under the jurisdiction of the State of South Dakota thereby.

CONCLUSION

The plaintiff brought this declaratory judgment action seeking declarations that the acts of Congress discussed herein, did not diminish the Rosebud Sioux Reservation or alter its boundaries from those defined in the Act of March 2, 1889. This Court has felt compelled to investigate and examine the legislative history of the three acts in question in order to make a determination in this action. *See*, Mattz v. Arnett, *supra*; Seymour v. Superintendent, *supra*; and United States ex rel. Feather v. Erickson, *supra*. As the United States Supreme Court said in the *Mattz* case, "A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92. It is this Court's opinion after having examined all the contemporary legislative materials, various government reports and discussions that the whole context of the acts from 1904 through 1910 had but one purpose in mind. It is clear that the purpose of those acts was to open those reservations to non-Indian settlers and to civilize those areas in what the Congressmen obviously regarded as an uncivilized portion of the United States. As each successive act was proposed in Congress various reports referred to a continuing diminished size of the Rosebud Reservation. Originally the reservation was said to comprise 3,000,000 acres, and later 1,800,000 acres, and finally to comprise a reservation roughly the size of 1,000,000 acres. The allotment sections, the school lands provisions, the many negotiations conducted by Inspector McLaughlin, the congressional reports and debates, and

the subsequent congressional enactments for each act lead this Court to believe and be of the opinion that the surrounding legislative history and the circumstances *clearly* indicate a congressional intent to separate each of the counties concerned, to return those counties to the public domain, and to extinguish the reservation or "Indian land" nature of those counties thereafter.

Certainly this is the treatment that has been accorded those counties from the time of the acts' passage on. There is no dispute but that the State of South Dakota has treated the counties of Mellette, Tripp, Gregory and what was at that time Lyman County, as portions of the state over which the State of South Dakota can exercise jurisdiction since the passage of those acts. In fact, the Eighth Circuit Court of Appeals has in the past assumed, but clearly without deciding, that Todd County was the Rosebud Reservation and that other acts had affected the territorial nature of the reservation. In Beardslee v. United States, 387 F.2d 280, 285 (8th Cir. 1967), the Court said:

> "All of Todd County is obviously within the original boundaries of the Rosebud Reservation. Only three acts of Congress have affected the territory of the reservation since its establishment in 1889 and none of these concern Todd County."

The Court then went on to cite the very three acts which this Court is concerned with herein. The above is cited not for the fact that the Eighth Circuit had decided the jurisdictional questions herein, but only for the fact that the jurisdictional boundaries were treated by common usage, to have been diminished by the three acts in question. This is distinguished from the situation in *Seymour. See,* Seymour v. Superintendent, 368 U.S. 351, 359, 82 S.Ct. 424, 7 L.Ed. 2d 346 (1962).

This Court feels that the following report by the Commissioner of Indian Affairs cited to this Court by the defendants and given in 1912 is very enlightening upon the whole subject discussed at length herein:

> "Under various acts passed by Congress within recent years, certain lands ceded by the Indians to the United States are open to settlement and entry, and the government endeavors to dispose of them at their appraised value to the benefit of the Indians.

> "Nearly all such acts contain a clause practically identical with the following:

>> 'That nothing in this act shall in any manner bind the United States to purchase any portion of the lands herein described . . . or to dispose of said land except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the intention of this act that the United States shall act as trustee for said Indians to dispose of the said lands, and to expend and pay over the proceeds received from the sale thereof only as received and as herein provided.'

> "It has been the practice to consider such lands under the jurisdiction and supervision of the General Land Office from the passage of the act, and the Indians' title thereto extinguished. On this theory the public at large has come to consider said lands a part of the public domain, and the lands have therefore been used indiscriminately by various interests, principally for grazing purposes, without compensation to the Indians.

> "By *departmental decision* of November 27, 1911, it was held in effect that the Indians' title to such land is not extinguished until the date of entry, settlement, or sale, and the Indians are entitled to their use, or to any revenue that may be derived from their use by others, pending date of settlement, sale or entry." Report of the Commissioner of Indian Affairs, p. 51 (1912). (Emphasis added).

The Commissioner did not question that the lands returned to the public domain but only when they did so.

This Court has examined the issues involved here very closely. The decision herein affects a large portion of the State of South Dakota. The decision will have great political, social, cultural and economic effects. From the time these acts were passed, these counties have been treated as outside the Rosebud Sioux Reservation by the settlers, their descendents, the State of South Dakota and the federal courts.

There can be little doubt but that the members of Congress coveted Indian lands. This Court must determine the intent of Congress as it existed at the turn of the century. Time and again the Indians were given reservations, only to have the settlers' need for land mandate a redefining of the reservation boundaries. While this Court does not necessarily agree with the mores or the methods employed at that time, there is little doubt that the congressmen were engaged in the process with the "doing away" of the reservations. This Court's only function is to determine congressional intent, not to rewrite history.

■ This Court is aware of the many decisions that various courts have rendered regarding the jurisdictional boundaries of various Indian reservations. However, each congressional act and treaty is different and must be so examined. As the Eighth Circuit Court of Appeals said in Kills Plenty, et al. v. United States, 133 F.2d 292, 295 (8th Cir. 1943):

> "It can, of course, be argued that the words 'within the limits of any Indian reservation' should mean the same thing in any statute, but the argument, we think, is unsound. . . . To find that meaning the words must be viewed in their setting, and the history and purpose of the Act must be considered."

The surrounding circumstances, the history, congressional and otherwise, and various documents, convince this Court that the three acts in question did diminish the Rosebud Sioux Reservation and that the State of South Dakota can exercise jurisdiction over Indian people in the counties of Gregory, Tripp, Mellette, and what was Lyman.

The defendants herein shall forthwith prepare the necessary papers to effectuate the opinion of this Court as expressed in this Memorandum Opinion.

## APPENDIX

The unshaded portion of the map represents those areas of the original reservation opened to settlement by the homestead acts.