**UNITED STATES of America ex rel. Tilden Louis CONDON, Appellee,**

v.

**Don R. ERICKSON, Warden of the South Dakota State Penitentiary, Appellant.**

**No. 72-1529.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1973.

Decided April 25, 1973.

Rehearing and Rehearing En Banc Denied May 29, 1973.

Thomas R. Vickerman, Asst. Atty. Gen., Pierre, S. D., and Andrew Aberle, Timber Lake, S. D., for appellant.

Richard A. Smith, Rosebud, S. D., for amicus.

John Simko, Sioux Falls, S. D., for appellee.

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This appeal presents the question of whether Eagle Butte, South Dakota is located within the boundaries of the Cheyenne River Indian Reservation. If it is, then South Dakota had no jurisdiction to charge and convict appellee Condon, an enrolled member of the Cheyenne Indian Tribe, for the rape of a 70 year old librarian at Eagle Butte. Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) and City of New Town, North Dakota v. United States, 454 F.2d 121 (CA8 1972).

18 U.S.C. § 1153 provides, among other offenses, that an Indian who commits rape against another Indian or other person within the "Indian Country" shall be subject to punishment within the exclusive jurisdiction of the United States. Indian Country, defined in 18 U.S.C. § 1151, means ". . . all land within the limits of any Indian reservation under the jurisdiction of the United States government . . ."[1] The boundaries of the Cheyenne River Indian Reservation were originally established by the Act of March 2, 1889, 25 Stat. 888. It has been held, however, that the portion of the reservation opened up to settlement (of which Eagle Butte is a part) by the Act of May 29, 1908, 35 Stat. 460 was severed from the reservation by the 1908 Act and no longer "Indian Country." United States v. LaPlant, 200 F. 92 (D.S.D.1911) and Lafferty v. State, 80 S.D. 411, 125 N.W. 2d 171 (1963). See also, State v.

Barnes, 81 S.D. 511, 137 N.W.2d 683 (1965). Compare, State v. Molash, 199 N.W.2d 591 (S.D.1972).

The rape was committed on November 2, 1964. Condon thereafter was arrested on federal charges and held in federal custody until April 16, 1965, when South Dakota arrested him on charges of first degree rape. Condon pleaded guilty in state court and received a fifteen-year sentence. Post-conviction efforts in state courts failed. State ex rel. Condon v. Erickson, 182 N.W.2d 304 (S.D.1970). Condon then petitioned the United States District Court for the District of South Dakota claiming that (1) he had been denied effective assistance of counsel and (2) the state was without jurisdiction to try him since the crime was committed on "Indian country," where federal jurisdiction is exclusive. We agreed with the trial court's denial of relief on the first issue but remanded with directions to hold an evidentiary hearing on the jurisdictional question. United States ex rel. Condon v. Erickson, 459 F.2d 663 (CA8 1972).

On remand, Judge Nichol granted Condon's petition for writ of habeas corpus holding that although it appeared that Congress diminished the boundaries of the Cheyenne River Reservation by implication in the Act of May 29, 1908, 35 Stat. 460 (thereby excluding Eagle Butte from the reservation), decisions by the Supreme Court and this Court commanded a contrary result. United

---

1. As a condition to achieving statehood, South Dakota incorporated into its State Constitution, adopted on October 1, 1899, Article XXII in which the State disclaimed all right and title to lands owned or held by Indians or Indian tribes. In 1901, the State relinquished to the United States exclusive jurisdiction and authority to arrest, prosecute, convict and punish all persons in violation of federal laws when committed upon any Indian Reservation. By the Act of February 2, 1903, 32 Stat. 793, Congress granted jurisdiction to the United States District Court for the District of South Dakota to hear and try persons committing certain crimes on Indian reservations. See, Kills Plenty v.

United States, 133 F.2d 292 (CA8 1943). For fifteen years Congress offered to the states, South Dakota included, to turn over civil and criminal jurisdiction of persons within Indian reservations. Act of August 15, 1953, § 7, 67 Stat. 588 (18 U.S.C, § 1162 and 28 U.S.C. § 1360), repealed, Pub.L. 90–284, Title IV, § 403(b), April 11, 1968, 82 Stat. 79 (25 U.S.C. § 1323). South Dakota apparently could never muster sufficient popular support in order to accept the United States' offer of jurisdiction. See, Staff Report, "Jurisdiction Over Indian Country in South Dakota," (South Dakota State Legislative Research Council, March 5, 1964) and State v. Molash, 199 N.W.2d 591, 593 (S.D.1972).

States ex rel. Condon v. Erickson, 344 F.Supp. 777 (D.S.D.1972).

On appeal, the State and the United States by *amicus curiae* urge that the 1908 Act changed the boundaries of the reservation so as to exclude from the reservation the portion in which Eagle Butte is located.

## BACKGROUND

"Federal Indian law is a subject that cannot be understood if the historical dimension of existing law is ignored." F. Cohen, Handbook of Federal Indian Law, XIII (Introduction by N. Margold) (1942). Prior to 1850 the Mississippi River was considered to be the general dividing line between "civilization" and the "Indian Country." *See,* Act of June 30, 1834, 4 Stat. 729. The Sioux, who were driven west of the Mississippi by the Chippewa in the early 18th century, roamed the Missouri Valley freely. They followed the buffalo herds which provided them food, shelter and clothing. At this time their lands were definitely unwanted and considered worthless by their neighbors to the east. Soon, however, farming settlers began crossing the Mississippi pushing westward and others carved out great trails through Sioux lands heading for the Oregon's Willamette valley and western gold fields. The Sioux and their buffalo herds were then threatened by the invaders and constant conflict followed. Finally, in the Treaty of April 29, 1868 at Fort Laramie, the Sioux agreed to a territory encompassing approximately the western one-half of present-day South Dakota, bordered on the east by the Missouri River and portions of present-day Nebraska on the south. This area was known as the Great Reservation of the Sioux Nation.

The demand for Indian lands grew with immigrant settlers flooding in by the thousands. The buffalo became nearly extinct by 1885 and the Sioux had to adjust to a life on the reservation which consisted almost entirely of residing adjacent to government agencies and eating government furnished food. An alliance arose between easterners sympathetic to the Indians and western politicians. From this alliance came an Indian policy by which the Indians allegedly were to become "civilized" in part by receiving allotments or parcels of land and agriculture tools to enable them to create a subsistence of their own.[2]

After the Indians commenced farming on their allotments, a large portion of their reservation was no longer necessary for their purposes and became "surplus." In the Act of March 2, 1889, 25 Stat. 888, the Great Sioux Reservation was divided into seven separate reservations, one of which is the Cheyenne River Indian Reservation.[3] The new reservations were to be "permanent" and the lands outside the new boundaries were expressly restored to the public domain. 25 Stat. 888, 896, (§ 21) and Act of April 30, 1888, 25 Stat. 94 (§ 21). As of 1904 the Indian population on the Cheyenne River Reservation was 2,557,[4] and by 1908 the reservation encompassed 2,867,840 acres of which 320,-631 had been allotted to 934 Indians, leaving unallotted and theoretically "surplus" some two and one-half million acres. F. Webb, Handbook of American Indians North of Mexico, H.R.Doc.No. 926, Part 2, 59th Cong., 1st Sess. 386 (1910).

By the Act of May 29, 1908, 35 Stat. 460, Congress opened to settlement the surplus or unallotted lands in the Cheyenne River and Standing Rock reserva-

---

2. See, General Allotment Act (Dawes Act), Act of February 8, 1887, 24 Stat. 388.

   It has been estimated that the Indian farmers achieved a minimally successful crop only one out of every five years, the other four were destroyed by drought or flood. See G. Hyde, A Sioux Chronicle (1956). See also, Annual Reports of the Dept. of Interior, 328–333 (1905).

3. For an account of the methods used in the 1880's by the agents of the "Great White Father" to obtain the consent of the Indians to the agreement, see G. Hyde, A Sioux Chronicle (1956).

4. 1 Kappler, Indian Affairs—Laws and Treaties, 1030 (1904).

687

tions. 80,142 persons registered to homestead. South Dakota Legislative Manual, 131 (1911). The area opened includes the site where Eagle Butte is now located.

## THE 1908 ACT

■ We cannot say that the 1908 Act on its face affected the exterior boundaries of the reservation, although it is admittedly a close question. The Act authorized the Secretary of the Interior "to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations . . . being within the following described boundaries, . . . except such portions thereof as have been allotted to Indians: . . . ." The lands were to be disposed of by presidential proclamation under the prevailing federal homestead and town-site laws.[5] In nearly all respects, the language of the 1908 Act is identical to other contemporaneous acts held not to have changed the boundaries of the respective reservations involved. *See*, Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) and City of New Town, North Dakota v. United States, 454 F.2d 121 (CA8 1972).

Appellee thinks it significant that the 1908 Act provided for the proceeds from the sale of the lands to be deposited into the Treasury of the United States and credited to the Indians as was the case in the 1906 (*Seymour*) and 1910 (*New Town*) acts. This method contrasts with prior acts wherein payment for the lands was made directly to the Indians. It has been aptly pointed out, however, that this was simply a new method utilized by a Congress that no longer favored purchasing Indian lands and providing them free of cost to settlers. "New Town et al: the Future of an Illusion," 18 South Dakota L.Rev. 85, 94–98 (1973).[6]

Appellant relies primarily on two provisions found within the 1908 Act which are not present in either the 1906 or 1910 Acts. In § 2 of the 1908 Act it is stated as a proviso that the Secretary may permit Indians who have received allotments in the area opened to settlement to relinquish such and receive a new allotment "within the respective reservations thus *diminished*. . . ." (emphasis added). This proviso is subject to two competing constructions. The reservation thus diminished, as contended by appellant, means a smaller reservation with adjusted boundaries. On the other hand, the reservation could have retained its original exterior boundaries even though the portion held by Indians was diminished by virtue of the sale of lands within the boundaries to outsiders. Indeed, this would be consistent with 18 U.S.C. § 1151 defining Indian country as lands within the limits of a reservation *notwithstanding the issuance of any patent.*

More persuasive from appellant's standpoint is the final sentence of the act, the second proviso of § 9. This section provides that Indians residing upon allotments in a northern strip of townships may use the timber thereon for domestic purposes "only as long as the lands remain part of the *public domain*." (emphasis added.) Since the townships are located within the area opened to settlement, appellant asserts that this proviso is declaratory of Congress' intent that the entire area be restored to the public domain and therefore it is no longer within the 1889 boundaries of the reservation. Appellee argues poor draftsmanship by the authors of the Act. Both are plausible, but Congress may have intended to restore only this Northern strip of townships to the public domain for a limited period until the lands were sold to the homesteading set-

---

5. In § 7, Congress made a specific grant of sections 16 and 36 of each township to the states for the use of the common schools.

6. This method became quite unpopular from the standpoint of the Indian, who wanted the money in his pocket rather than deposited for his "benefit" in the Treasury of the United States. *See* G. Hyde, A Sioux Chronicle (1956) and H.R.Rep.No. 1539, 60th Cong., 1st Sess., 21–28 (1908).

tlers. If such were the case, the remaining open area in which Eagle Butte is now a part would not have been affected.

## LEGISLATIVE HISTORY

Resort to the applicable contemporaneous and subsequent legislative history is not helpful. Both the House and Senate Committee reports[7] are silent as to the 1908 Act's effect upon the boundaries of the Cheyenne River Reservation. Appellant points out the various references in the reports and attached documents to a *diminished* reservation and a *relinquishment* of land by the Indians. A reservation, however, as already pointed out, may be diminished in land size by sale of portions thereof to non-Indians without changing the reservation's boundaries.

As in *Seymour* and *New Town*, the subsequent Congressional treatment of the reservation has been inconsistent. In the Act of July 11, 1940, 54 Stat. 1336, pt. 2, Congress referred to the opened areas as the *ceded* areas of the reservation. In 1952, The Secretary of Interior restored to the reservation part of the opened lands, ". . . being within the boundaries of the *former* Cheyenne River Reservation. . . ." 17 Fed.Reg. 1065, 1066 (1952). Congress, however, in the Act of June 23, 1910, 36 Stat. 602, pt. 1, authorized the sale of certain of these lands within the opened area to the Milwaukee Land Company, referring to the property as "surplus and unallotted lands *in* the Cheyenne River Reservation. . . ."

The historical relationship between the United States and the Sioux was primarily one of a continuous conflict over the acquisition of Sioux lands by the settlers and their government. The Sioux's land was acquired by conquest, by treaty and then by Act of Congress. In the earlier acts and treaties, Congress restored the lands acquired to the public domain and then allowed homesteading by settlers free of cost. Later, Congress opened the lands to settlement, selling the lands to homesteaders and depositing the funds in the Treasury to the credit of the Indians. In these later acts, in which the 1906 (*Seymour*), 1910 (*New Town*) and the 1908 Acts are included, Congress did not expressly restore the opened lands to the public domain.

█ It was originally held that Indian Country ceased to be such whenever Indians lost title to the land, Dick v. United States, 208 U.S. 340, 359, 28 S. Ct. 399, 52 L.Ed. 520 (1908); United States v. LaPlant, 200 F. 92 (D.S.D. 1911); Bates v. Clark, 95 U.S. 204, 24 L.Ed. 471 (1877); and F. Cohen, Handbook of Federal Indian Law, 7 (1942). This view has been laid to rest by the present definition of "Indian Country" which includes all land within an Indian reservation *notwithstanding the issuance of any patent. See Seymour, supra*, 368 U.S. at 357–358, 82 S.Ct. 424. *See also,* Kills Plenty v. United States, 133 F.2d 292 (CA8 1943). Therefore, the fact that the 1908 Act removes title to reservation lands from the Indians and places it into the hands of non-Indians does not, by itself, affect the exterior boundaries of the reservation.

We cannot say, as we did in *New Town*, that the 1908 Act "*clearly* by its own terms does not purport to alter the reservation boundaries" established by the 1889 Act. (emphasis added) 454 F. 2d at 125. Nor does a reading of the Act, its legislative history and its subsequent legislative treatment require the opposite conclusion. The Congressional intent underlying the 1908 Act with respect to the reservation's boundaries is not clearly discernible by application of the traditional methods of statutory construction.

In the final analysis, we conclude that in view of the principles expressed in *Seymour, New Town* and McClanahan v. State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973),

7. H.R.Rep.No.1539, 60th Cong., 1st Sess. (Misc. Vol. No. 2, April 20, 1908) and Sen.Rep.No.439, 60th Cong., 1st Sess. (Misc. Vol. No. 2, April 1, 1908).

*LaPlant* is no longer viable to the extent that it holds that the 1889 boundaries of the reservation were changed by the 1908 Act. *See also,* United States ex rel. Miner v. Erickson, 428 F.2d 623, 637–638 (CA8 1970) (Judge Lay, dissenting) and Putnam v. United States, 248 F.2d 292 (CA8 1957).

*Seymour* holds that the opening of an Indian reservation for settlement by homesteading is not necessarily inconsistent with its continued existence as a reservation. The Suprtme Court in *Seymour* also approved its prior statement in United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909) that "when Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." Finally, in *McClanahan, supra,* the Court reaffirmed the long standing "policy of leaving Indians free from state jurisdiction and control [which] is deeply rooted in the Nation's history." Rice v. Olson, 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945). See Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832) and Beardslee v. United States, 387 F.2d 280, 285 (CA8 1967) (Blackmun, J.).

Each case, of course, must be decided under the applicable statute and upon its own facts. Where as here, however, the question presented is close, we conclude that a holding favoring federal jurisdiction is required unless Congress has *expressly or by clear implication* diminished the boundaries of the reservation opened to settlement. We therefore affirm the trial court's decision that the original boundaries of the Cheyenne River Indian Reservation as established by the 1889 Act were unaffected by the 1908 Act. Eagle Butte, therefore, lies within "Indian Country," as defined by 18 U.S.C. § 1151 and the State Courts of South Dakota had no jurisdiction to try Condon for the offense. The writ of habeas corpus was properly granted.

Affirmed.