489 F.2d 99
 UNITED STATES of America ex rel. John Lee FEATHER,
Petitioner-Appellant,
v.
Don R. ERICKSON, Warden South Dakota State Penitentiary,
Defendant-Appellee.*
*Consolidated with;
U.S. ex rel. LaVerne Black Thunder
v.
Erickson,
U.S. ex rel. Ambrose St. John
v.
Erickson.
U.S. ex rel. James R. Keeble
v.
Erickson.
U.S. ex rel. Curtis Small
v.
Erickson.
U.S. ex rel. Roman V. Derby
v.
Erickson.
U.S. ex rel. Joseph Day
v.
Erickson.
U.S. ex rel. Arnold La Framboise
v.
Erickson.
U.S. ex rel. Clarence Walker
v.
Erickson.
U.S. ex rel. Theodore Duane Wynde
v.
Erickson.
 Nos. 73-1453 to 73-1459 and 73-1541 to 73-1543.
 United States Court of Appeals, Eighth Circuit.
 Submitted Oct. 18, 1973.
Decided Dec, 7, 1973, Rehearings and Rehearings En Banc
Denied Jan. 8, 1974.
 
 L. R. Gustafson, Britton, S.D., for petitioner-appellant.
 Walter W. Andre, Asst. Atty. Gen., Pierre, S.D., for defendant-appellee.
 Before HEANEY, ROSS and STEPHENSON, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 These consolidated habeas corpus appeals turn upon the issue of whether alleged criminal activity took place within 'Indian Country.' 18 U.S.C. 1151. We hold that the alleged crimes were committed within the confines of the Sisseton-Wahpeton (Lake Traverse) Indian reservation and therefore the State of South Dakota was without jurisdiction to convict appellants who are all enrolled Indians of the Sisseton-Wahpeton Indian tribe. The district court orders denying the writs of habeas corpus must be reversed.
 
 
 2
 'All land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent * * *' is 'Indian Country.' 18 U.S.C. 1151. Any Indian who commits certain specified crimes within Indian Country is subject to the exclusive jurisdiction of the United States. 18 U.S.C. 1153.
 
 
 3
 The individual appellants were all convicted of crimes by a South Dakota State district court and are now incarcerated at the South Dakota State Penitentiary. The facts of the respective cases are not here important. The parties agree that if the crimes were committed in Indian country the federal district court had exclusive jurisdiction. Appellants seek release claiming they were wrongfully tried by the state court for offenses over which only the federal courts had jurisdiction.[1]
 
 
 4
 This court has previously had occasion to rule on the issue of whether the land within the original boundaries of the Lake Traverse reservation remains Indian country for 18 U.S.C. 1151 purposes. DeMarrias v. State of South Dakota, 319 F.2d 845 (8 Cir. 1963).[2] In DeMarrias this court adopted the trial court's opinion and determined that Congress had restored the reservation land to the public domain and thereby removed it from the category of Indian country. See DeMarrias, supra affirming 206 F.Supp. 549 (D.S.D.1962). For reasons that will become evident we find it necessary to depart from the holding in DeMarrias.
 
 
 5
 The Lake Traverse reservation was established by treaty between the United States and the Sisseton-Wahpeton Sioux Indians in 1867. 15 Stat. 505. The reservation was said by Congress to be 'permanent.' 15 Stat. 505, 506 (Art. III).
 
 
 6
 Following the pattern as established in the General Allotment Act of February 8, 1887[3] the 'surplus' land within the Lake Traverse reservation was opened to non-Indian settlers after allotments were made to individual members of the Sisseton-Wahpeton tribe. Act of March 3, 1891. 26 Stat. 989, 1036. The area opened for settlement by the 1891 Act included all of the reservation that had not been previously allotted to tribe members.[4] The essential provisions of the 1891 Act reflect the agreement reached between the government and the Indians on December 12, 1889 whereby the Indians agreed to 'cede, sell, relinquish, and convey' the surplus lands to the United States. 26 Stat. 1036 (Art. I). In turn, the lands were opened for settlement:
 
 
 7
 * * * the lands by said agreement ceded, sold, relinquished, and conveyed to the United States shall immediately, * * * be subject only to entry and settlement under the homestead and townsite laws of the United States * * *. 26 Stat. 1039 (30).
 
 
 8
 President Benjamin Harrison Formally proclaimed the lands opened for settlement. 27 Stat. 1017.
 
 
 9
 We must answer this question: Did the 1891 Act either on its face, or alternatively, when considered with the contemporaneous and subsequent legislative history, manifest Congressional intent to diminish the Lake Traverse reservation boundaries?
 
 
 10
 We have these guidelines: (1) Intent to abrogate treaty rights is not lightly imputed to Congress. Menominee Tribe of Indians v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); (2) Congress having once established a reservation, all tracts remain a part of that reservation until separated therefrom by Congress. United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909); Seymour v. Superintendent, 368 U.S. 351, 359, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). Indeed, Congressional intent to disestablish the reservation must be either expressed on the face of the Act or be clearly discernible from the 'surrounding circumstances and legislative history.' Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973); United States ex rel. Condon v. Erickson, 478 F.2d 684, 689 (C.A.8, 1973); (3) Opening an Indian reservation for settlement by homesteading is not necessarily inconsistent with its continued existence as a reservation. Seymour, supra. See also Condon,supra; City of New Town, North Dakota v. United States, 454 F.2d 121, 125 (C.A.8, 1972); (4) The well-preserved general rule is that Indians are to be left free from state jurisdiction and control. McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Condon, supra at 689 of 478 F.2d and citations. Federal jurisdiction is preferred. McClanahan, supra.
 
 
 11
 The case before us is not unlike Seymour, Mattz and Condon. The overall claimate of legislavive activity concerning Indian reservations during the period from 1887 through 1910 received its primary impetus from the General Allotment Act. See Cohen, supra at 78-80 (11-13). The 1891 Act, by its express terms, refers to the General Allotment Act of 1887. Just as in the beforementioned three cases, the reservation here was not sold to the government outright but merely opened for settlement under the homestead laws and the 1887 general allotment plan. Allotment and homesteading do not suggest congressional purpose to terminate the reservation. Seymour, supra.
 
 
 12
 Appellee leans upon a phrase extracted from section 30 of the 1891 Act.[5] The phrase ', and be subject to the laws of the state wherein located' is read by appellee to confer state jurisdiction upon the entire portion of land opened to homesteading. Appellant argues a misplaced comma and contends that only school lands, sections sixteen and thirty-six, are subject to state jurisdiction. Appellant's argument is more plausible in light of the general pattern adopted by Congress in making specific grants of these numbered sections in each township to the states. See, e.g., 33 Stat. 319, 323; 35 Stat. 458, 459; 35 Stat. 460, 461; Condon, supra at 687 n. 5 (specifically granting said sections to the states) and 28 Stat. 314, 319; 28 Stat. 326, 332; 31 Stat. 672, 676 (using the same language as the instant statute but no comma placed before the 'and' of the 'subject to state law' clause). We do not read this clause as a clear indication of congressional intention to terminate the Lake Traverse reservation. Seymour, Mattz, Condon, all supra.
 
 
 13
 The Mattz case makes clear that congress, during the legislative years surrounding the 1891 Act 'was fully aware of the means by which termination could be effected.' Mattz, supra 412 U.S. at 504, 93 S.Ct. at 2257 & n. 22. Clear language such as that discussed in Mattz expressing intent to discontinue the Lake Traverse reservation is nowhere to be found in the 1891 Act here involved.
 
 
 14
 Nothing that can be gleaned from the legislative history or subsequent legislative enactments can be fairly said to shed any further light upon the intent of the Congress regarding the reservation boundaries. The Committee reports on the 1891 Act[6] and reports on similar bills that were not enacted[7] do not discuss the proposed boundaries. The only direct reference to the boundaries of the reservation subsequent to the 1891 Act came from President Harrison in his proclamation opening the lands 'within the Lake Traverse Reservation' to settlement. 27 Stat. 1017. This reference is by no means conclusive.
 
 
 15
 Unlike the subsequent legislative treatment in New Town the later congressional enactments here are not 'admittedly inconsistent and confusing.' New Town, supra at 125 of 454 F.2d. Accord, Condon, supra at 688 of 478 F.2d; Seymour, supra 368 U.S. 351, at 427 n. 12 of 82 S.Ct. Unlike Mattz we have here no evidence that 'the House was generally hostile to continued reservation status of the land in question.' Mattz, supra at 499 of 412 U.S., at 2255 of 93 S.Ct. Those decisions on closer factual situations found the reservations not to have been diminished.
 
 
 16
 We must view as significant the fact that our search of the legislative documents subsequent to the 1891 Act unearths no telltale language as to the lawmaker's will concerning the boundaries of the Lake Traverse reservation. The significance lies, of course, in the test to be applied. That is, congressional expression or clear implication diminishing the reservation boundaries.
 
 
 17
 Finally, we think it noteworthy that the South Dakota Supreme Court, while interpreting an Act similar to the Act in issue here, has recognized the principles established in Seymour and New Town and denied state jurisdiction in an analogous situation. State v. Molash, 199 N.W.2d 591 (1972).
 
 
 18
 Congress established the Lake Traverse reservation as a 'permanent' reservation in 1867. Since that time Congress has not through clear expression or by innuendo shown an intention to disestablish.
 
 
 19
 The result we reach today is, of course, contrary to the result we reached in 1963. DeMarrias, supra. The more recent teachings of the United States Supreme Court and of this Court, set out above, have been premised upon legislative enactments and history analogous in all material respects to the instant case. To reach a different result in this case would be, we think, to ignore the clear impact of the decisions discussed above. We therefore now hold that the body of legislative documents concerning the Lake Traverse Indian reservation does not, against the glare of Seymour and the more recent judicial guidance in Mattz, Condon and New Town, demonstrate congressional intention to disestablish the reservation.
 
 
 20
 The boundaries of the Lake Traverse Indian reservation remain as they were established in 1867. The scene of the alleged crimes is, therefore, within Indian country. South Dakota had no jurisdiction to try appellants. The writs of habeas corpus should have been granted.
 
 
 21
 Reversed and remanded for proceedings consistent with this opinion.
 
 
 
 [1]
 Two of the appellants claim tribal authority to deal with the crimes committed (forgery). 18 U.S.C. 1152. Forgery is not one of the specified crimes within 18 U.S.C. 1153
 
 
 [2]
 The case had a long prior history before reaching our court. State v. DeMarrias, 79 S.D. 1, 107 N.W.2d 255 (1961), cert. denied, 368 U.S. 844, 82 S.Ct. 72, 7 L.Ed.2d 42; DeMarrias v. State of South Dakota, 206 F.Supp. 549 (D.S.D.1962). See also Application of DeMarrias, 77 S.Ct. 294, 91 N.W.2d 480 (1958)
 
 
 [3]
 24 Stat. 388. For an excellent general discussion of the General Allotment Act see Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 2253-2254, 37 L.Ed.2d 92; F. Cohen, Handbook of Federal Indian Law (1942) at 78-79, 207-217
 
 
 [4]
 The 1891 Act also made provision for some additional allotments to the Sisseton-Wahpeton tribe as reparations for their loyal service to the country during the 1862 Sioux uprising. 26 Stat. 989, 1037, 1039. See also the preamble to the original treaty of 1867. 15 Stat. 505; S.Ex.Doc.No.66, 51st Cong., 1st Sess. (189) at 1
 
 
 [5]
 The relevant portion of section 30 states:
 'That the lands by said agreement ceded, sole, relinquished, and conveyed to the United States shall immediately, * * * be subject only to entry and settlement under the homestead and townsite laws of the United States, excepting the sixteenth and thirty-sixth sections of said lands, which shall be reserved for common school purposes, and be subject to the laws of the State wherein located * * *.' 26 Stat. 1039 (30).
 
 
 [6]
 H.Rept.No.2325, 51st Cong. 1st Sess. (1890); S.Rept.No.1510, 51st Cong. 1st Sess. (1890)
 
 
 [7]
 E.g., S.Rept.No.661, 51st Cong. 1st Sess. (1890); H.Rept.No.2271, 51st Cong. 1st Sess. (1890); S.Ex.Doc.No.66, 51st Cong. 1st Sess. (1890)