UNITED STATES of America,
Plaintiff,

v.

Chauncey Wesley LONG ELK,
Jr., Defendant.

UNITED STATES of America,
Plaintiff,

v.

Ralph Emeron TAKEN ALIVE,
Defendant.

UNITED STATES of America,
Plaintiff,

v.

Clarence Lorin PAY PAY, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Donald Dean MARTIN, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Adolph HEPPER, Defendant.

UNITED STATES of America,
Plaintiff,

v.

Daris Alfred JANIS, Defendant.

Nos. CR75–1008, CR75–1024, CR75–1026,
CR75–1027, CR75–1028, CR75–1034
and CR75–1035.

United States District Court,
D. South Dakota, N. D.

April 8, 1976.

William F. Clayton, U.S. Dist. Atty., D.S.D., and Robert D. Hiaring, Asst. U.S. Atty., Sioux Falls, S.D., for plaintiff.

Jerald M. McNeary, Aberdeen, S.D., for defendant Long Elk.

Donald L. Gellhaus, Aberdeen, S.D., for defendant Taken Alive.

John L. Maynes, Aberdeen, S.D., for defendant Pay Pay.

Arend E. Lakeman, Mobridge, S.D., for defendant Martin.

Tom D. Tobin, Winner, S.D., Charles Rick Johnson, Gregory, S.D., for defendant Hepper.

Kennith L. Gosch, Aberdeen, S.D., for defendant Janis.

Marvin J. Sonosky, Washington, D.C., for Standing Rock Sioux Tribe as amicus curiae.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This memorandum addresses motions to dismiss for lack of jurisdiction filed by six named defendants charged by separate indictments.[1] All parties agree that the sole issue raised by the motions to dismiss is whether the Act of February 14, 1913, c. 54, 37 Stat. 675, terminated and returned to the public domain all unallotted land embraced within the eastern portion of the Standing Rock Indian Reservation. If the Reservation was terminated, the plaintiff would be deprived of criminal jurisdiction exercised pursuant to 18 U.S.C. Section 1151(a) and other applicable statutes.[2]

The ultimate determination of the issue before this Court will have far-reaching impact and will not be limited to the confines of the criminal jurisdiction dispute. The Court is cognizant of the realities and has carefully considered the record and briefs submitted by counsel.[3]

## PRELIMINARY STATEMENT

The Standing Rock Indian Reservation was created by the Act of March 2, 1889, c. 405, Section 3, 25 Stat. 888. The statutory description of the Standing Rock Reservation was as follows:

> Beginning at a point in the center of the main channel of the Missouri River, opposite the mouth of Cannon Ball River; thence down said center of the main channel to a point ten miles north of the mouth of the Moreau River, including also within said reservation all island (sic), if any, in said riv-

---

1. *United States v. Chauncey Wesley Long Elk, Jr.,* CR75–1008; *United States v. Ralph Emeron Taken Alive,* CR75–1024; *United States v. Clarence Lorin Pay Pay,* CR75–1026; *United States v. Donald Dean Martin,* CR75–1027 and CR75–1028; *United States v. Adolph Hepper,* CR75–1034; *United States v. Daris Alfred Janis,* CR75–1035. A seventh defendant has also filed a motion to dismiss for lack of jurisdiction. That case, *United States v. Herman Cameron, III,* CR75–1030, arises from the western portion of the Standing Rock Reservation affected by the 1908 Act and this memorandum makes no disposition of that case.

2. 18 U.S.C. Section 1151(a) provides in substance that " 'Indian country' * * * means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent * * *."

3. Mr. Tom Tobin, Winner, South Dakota, submitted joint briefs for the defendants. The Standing Rock Sioux Tribe submitted a brief as Amicus Curiae.

er; thence due west to the one hundred and second degree of west longitude from Greenwich; thence north along said meridian to its intersection with the South Branch of Cannon Ball River, also known as Cedar Creek; thence down said South Branch of Cannon Ball River to its intersection with the main Cannon Ball River, and down said main Cannon Ball River to the center of the main channel of the Missouri River at the place of beginning.

As originally constituted, the Reservation embraced all of Corson County in South Dakota and Sioux County in North Dakota.

Shortly after the turn of the century, there was increasing pressure to open for settlement large portions of Indian reservations in South Dakota and other states. In 1908 Congress passed a surplus land statute which opened for settlement the western half of the Standing Rock Reservation. Act of May 29, 1908, c. 218, 35 Stat. 460. This Act affected approximately one half of the original Reservation area.

The 1908 Act did not diminish the pressure for additional land. In 1909 a bill was introduced into Congress which would open for settlement the unallotted lands in the eastern or remaining portion of the Standing Rock Reservation unaffected by the 1908 Act. S. 3284, 61st Cong., 2d Sess. (1909). The Secretary of the Interior dispatched Inspector James McLaughlin to the Standing Rock Agency for the purpose of explaining the purpose of the Bill and to obtain an expression of the views of the Indians concerning the Bill. After receipt of the report of Inspector McLaughlin, the Secretary of the Interior recommended that various changes be made in the provisions of the Bill.[4] The Bill was reported to the Senate on April 7, 1910, with recommendations that certain amendments be made thereto.[5] An additional report was submitted by Senator Gamble on April 25, 1910.[6] The Bill was passed in the Senate on June 16, 1910.[7] S. 3284 was introduced into the House of Representatives on June 17, 1910, and was referred to the House Committee on Indian Affairs from which it was never reported out.[8]

The question was revived in the 62nd Congress on April 6, 1911, when S. 109, 62nd Cong., 1st Sess. (1911) was introduced by Senator Gamble. Inspector McLaughlin was directed to return to the Standing Rock Reservation and explain the provisions of S. 109. Inspector McLaughlin met with members of the Standing Rock Sioux Tribe on November 28, 1911. His report to the Secretary of the Interior dated December 16, 1911, indicated that many members of the Standing Rock Sioux Tribe were not in favor of the pending legislation.[9] The report also contained several recommended amendments to S. 109. The Business Council of the Standing Rock Sioux Reservation formally opposed the Bill by resolution dated January 6, 1912.[10]

The Bill was reported to the full Senate on January 22, 1912. Floor debate began on January 29, 1912, and the Bill passed the Senate shortly thereafter.

4. Letter from the Secretary of the Interior to the Hon. Moses Clapp, Chairman of the Committee on Indian Affairs, United States Senate, expressing the views of the Department on S. 3284, 61st Cong., 2d Sess. (1909). The letter is dated April 5, 1910, and is reported in S.Rep. No.517, 61st Cong., 2d Sess. (1910).

5. S.Rep.No.517, 61st Cong., 2d Sess. (1910).

6. S.Rep.No.590, 61st Cong., 2d Sess. (1910).

7. 45 Cong.Rec. 8244 (1910).

8. 45 Cong.Rec. 8446 (1910).

9. Letter from James McLaughlin to the Secretary of the Interior, December 16, 1911, reporting on conferences with the Indians of the Standing Rock Reservation with reference to the sale and disposition of the surplus lands of their reservation, as contemplated by S. 109, 62nd Cong., 1st Sess. (1911). The letter is reported in H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912).

10. Resolution of the Business Council of the Standing Rock Sioux Reservation, January 6, 1912, opposing S. 109.

On the House side, similar legislation had been introduced. Subsequent to the passage of S. 109 in the Senate, action was delayed on legislation which would open the remaining portion of the Standing Rock Reservation in the House of Representatives. The apparent reason was the strong opposition voiced by the Indians to the provisions contained in S. 109. The matter was referred to the Department of the Interior for further review and the Department reported on S. 109 on April 30, 1912.[11] S. 109 was reported to the full House on May 1, 1912.[12] Procedural rules precluded full consideration of the Bill since it was before the House on the Unanimous Consent Calendar and consideration met with opposition from some Congressmen.[13]

Congressman Burke re-introduced the Bill on January 6, 1913, by motion to suspend the rules. After a short debate, S. 109 was passed by the House of Representatives[14] and the President signed the Bill on February 14, 1913. The Standing Rock Reservation was formally opened for settlement by Proclamation on March 18, 1915.[15]

### 1913 ACT

The Court is guided by principles recently expressed when considering whether an Indian Reservation has been terminated by Act of Congress. The focal point of judicial inquiry is the intent of Congress. *DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87, 89 (8th Cir. 1975). Reservation status may survive the mere opening of a reservation to settlement. The congressional determination to terminate must be expressed on the face of the act or be clear from the

surrounding circumstances and legislative history. *DeCoteau,* supra, 420 U.S. at 444, 95 S.Ct. at 1093, 43 L.Ed.2d at 314.

It is clear from *DeCoteau* that our inquiry may encompass all materials reasonably pertinent to the legislation, including the debates thereon and official correspondence with respect thereto, and administrative treatment of the area; as well as those bearing upon the historical context of its passage, such as the social forces then at work in the area and particularly the demands of our westward moving society arrayed against the contesting demands of the Indians for their culture and support.

*Rosebud,* supra at 91. Legislation affecting other Indian Reservations and contemporary with the particular Act at issue may assist the Court in determining congressional intent. *See United States ex rel. Cook v. Parkinson,* 525 F.2d 120, 123 (8th Cir. 1975); *Rosebud,* supra at 104–105.

Before proceeding the Court notes that the Supreme Court of South Dakota has held that the 1913 Act did not terminate the eastern portion of the Standing Rock Reservation. *State v. Molash,* 86 S.D. 558, 199 N.W.2d 591 (1972). The reluctance of that Court in so holding is manifested by the recommendation of three of the Justices that the Attorney General of South Dakota file a petition for writ of certiorari with the United States Supreme Court. *Molash,* supra at 594. Subsequent to the *Rosebud* decision the Supreme Court of South Dakota addressed the *Molash* case in the following language:

> *  *  *  In *State v. Molash,* 86 S.D. 558, 199 N.W.2d 591, we found that

---

11. Letter from the First Assistant Secretary of the Interior to the Hon. John H. Stephens, Chairman of the Committee on Indian Affairs, House of Representatives, reporting on S. 109, 62nd Cong., 1st Sess. (1911). The letter is dated April 30, 1912, and is reported in H.R. Rep.No.637, 62nd Cong., 2d Sess. (1912).

12. H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912).

13. See 48 Cong.Rec. 6848 (1912); 48 Cong. Rec. 7559 (1912); 48 Cong.Rec. 9077 (1912).

14. 49 Cong.Rec. 1109 (1913).

15. Proclamation of the President, March 18, 1915, 39 Stat. 1721.

the Standing Rock Reservation was not disestablished by the Act of 1913 (37 Stat. 675). This Act is strikingly similar to the Act of 1907 herein involved in this case. \* \* \* It should be noted that at the time this court decided *State v. Molash*, supra, we did not have the benefit of the comprehensive citations leading to an analysis of the "legislative history" and "surrounding circumstances" from which the intent of Congress could be established when it passed the Act dealing with the Standing Rock Reservation. \* \* \*

\* \* \* \* \* \*

We also suggested in *State v. Molash*, supra, that certiorari be requested to determine the question therein presented.

Whether *State v. Molash*, supra, can withstand the scrutiny of the intent expressed by Congress at that time or the circumstances surrounding the enactment of the Act of 1913 remains for future decisions. \* \* \*

*State v. White Horse*, S.D., 231 N.W.2d 847, 850–851 (1975). While this Court is not free to speculate as to the present opinion of the South Dakota Supreme Court concerning this subject, it is clear that the precedential value of the *Molash* opinion has been severely eroded.

The Court of Appeals for the Eighth Circuit in *Rosebud* and *Cook* addressed similar issues now before this Court. The Court held that each of the four acts at issue in those cases terminated the reservation status of the particular tracts described and returned the unallotted portions to the public domain.[16] The four acts affected reservations wholly within South Dakota and spanned a time period from 1904–1910.

■ Defendants emphasize that the similarities between the above acts and the 1913 Act compel a finding that the 1913 Act terminated the eastern portion of the Reservation. The Court finds this reasoning to be persuasive.

The phraseology in each of the five acts is, in substance, identical. At the time each act was first introduced, Inspector McLaughlin was dispatched as the representative of the United States to explain the provisions of the pending legislation to the various Tribes and to obtain an expression of views from the Indian people. The names of Senator Gamble and Representative Burke of South Dakota appear in the legislative history of all five acts and they were the primary proponents of this series of legislation. See *Rosebud*, supra at 96, n. 28.

The legislative history and documentation of the 1913 Act make it clear that this Act was merely a continuation of a congressional policy of reservation termination in response to the "familiar forces" noted in *DeCoteau*, supra, 420 U.S. at 431, 95 S.Ct. at 1086, 43 L.Ed.2d at 306, and *Rosebud*, supra at 91.[17]

I was in hopes this would be deferred two years, or at least one year, or until you were receiving something from the proceeds of the last *Cession*, but the view taken by members, with whom I discussed the matter, is that it will require about two years to bring about the opening of the lands, and *the pressure upon Congressmen for the opening of the surplus lands of Indian reservations in South Dakota*

---

**16.** Act of April 23, 1904, c. 1484, 33 Stat. 254 (Rosebud); Act of March 2, 1907, c. 2536, 34 Stat. 1230 (Rosebud); Act of May 30, 1910, c. 260, 36 Stat. 448 (Rosebud); Act of May 27, 1910, c. 257, 36 Stat. 440 (Pine Ridge).

**17.** \* \* \* But familiar forces soon began to work upon the Lake Traverse Reservation. A nearby and growing population of white farmers, merchants, and railroad men began urging authorities in Washington to open the reserva-

tion to general settlement. The Indians, suffering from disease and bad harvests, developed an increasing need for cash and direct assistance. \* \* \* *DeCoteau*, supra 420 U.S. at 431, 95 S.Ct. at 1086, 43 L.Ed.2d at 306.

\* \* \* The original Rosebud Reservation was an area of great extent. Subsequent to its delineation, however, the "familiar forces" above noted came into operation. \* \* \* *Rosebud*, supra at 91.

*and North Dakota is such that they cannot do otherwise than introduce the bills. The emmigration (sic) to this country, together with the rapid increase of population, and the demand for land for homeseekers is such that Congress is determined to open up all surplus lands as rapidly as consistent.* I fully believe that in three years from now there will be no surplus Indian lands in the Northwest, and much, my friends, as you may dislike it, you must prepare yourselves for its coming. * * * [18] (Emphasis added).

As I have recited upon a former occasion, on the opening of the Sisseton Reservation, in the northeastern part of the State, $2.50 per acre was paid by the Government to the Indians for the *cession* of the lands in sections 16 and 36, and $3.50 was paid per acre on the opening of the Yankton Reservation in the same State. The *same policy has been pursued in connection with the opening of Gregory County, a part of the Rosebud Reservation, for which $2.50 per acre was paid. The same is true as to lands in Tripp County, in the Rosebud Reservation, and in two bills already passed during the present session for the opening of other lands in the Rosebud Reservation and in the Pine Ridge Reservation the same policy has been pursued.* * * * [19] (Emphasis added).

* * * The provisions of the bill are substantially the same as other laws which have been enacted for the sale of surplus lands in Indian reservations.

. . .

We have a precedent for this legislation in the law which was enacted some years ago for opening a portion of the Rosebud Reservation. * * * [20] (Emphasis added).

* * * I want to state to the gentleman from Wisconsin (Mr. Cooper) that *this bill,* as I have already stated, *is in substantial conformity with the bills that we have been passing in the last 10 years in relation to the disposition of the surplus of Indian lands in reservations,* with the exception that it is perfected and is, therefore, a better measure * * * (Emphasis added).[21]

The purpose of the bill is to authorize the sale of the surplus or unallotted lands in the Standing Rock Indian Reservation in the States of North and South Dakota, and *its general provisions are identical with other acts that have heretofore been passed for the sale and disposition of Indian reservations.* (Emphasis added).[22]

Only one year prior to the introduction of the first bill authorizing the opening of the eastern half of the Reservation, Congress had enacted a bill opening the western half of the Standing Rock Reservation. Act of May 29, 1908, c. 218, 35 Stat. 460. That Act was held not to have diminished the boundaries of the Cheyenne River Reservation and by implication necessarily meant that the exterior boundaries of the western portion of Standing Rock were not diminished. *United States ex rel. Condon v. Erickson,* 478 F.2d 684 (8th Cir. 1973). The Court indicated in *Condon* that the question had been close.

Each case, of course, must be decided under the applicable statute and upon its own facts. Where as here, however, the question presented is close, we conclude that a holding favoring federal jurisdiction is required unless

---

**18.** Proceedings of a Council with the Indians of the Standing Rock Agency, Standing Rock Reservation, January 7, 1910, at 3 (Remarks of Inspector James McLaughlin).

**19.** 45 Cong.Rec. 5788 (1910) (remarks of Senator Gamble).

**20.** 49 Cong.Rec. 1106 (1913) (remarks of Representative Burke).

**21.** 49 Cong.Rec. 1108 (1913) (remarks of Representative Burke).

**22.** H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912) at 3–4.

Congress has *expressly or by clear implication* diminished the boundaries of the reservation opened to settlement.

. . .

*Condon*, supra at 689. *Condon* pre-dates *DeCoteau*, *Rosebud* and *Cook* and its continued viability remains to be decided by the Court of Appeals for the Eighth Circuit.

■ The 1908 Act is not before this Court, but it is relevant in resolving the issue now pending. The provisions of the 1908 and 1913 Acts are similar. The 1908 Act was a frequent topic of discussion when one reviews the legislative history of the 1913 Act. It is particularly relevant when considered in light of the interpretation placed upon the phrase "diminished reservation" by the Court of Appeals.

The phrase "diminished reservation" was interpreted to mean in *Rosebud* that the reservation was reduced geographically rather than in the sense urged by appellant here that there was a loss of tribal lands *within* the reservation. (citation omitted).

*Cook*, supra at 123. Throughout the materials concerning the 1913 Act, there are repeated references that the 1908 Act affecting the same Reservation "diminished" the exterior boundaries of the Reservation.

* * * Furthermore, I, having been intimately acquainted with the Standing Rock Indians for the past thirty years and believing that the opening of the surplus lands of their reservation will be beneficial to them as a people, as well as in the interests of the ˙service, I respectfully recommend that legislation for the opening of their *diminished reservation* be enact-ed along the lines of Senate Bill 109, 62nd Congress, 1st Session, with the modifications herein suggested, and that at least one reasonable cash payment be made to them from the proceeds of their lands opened by the Act of May 29, 1908. (Emphasis added).[23]

WHEREAS, The Tribal Business Committee of the Standing Rock Sioux Reservation held a special meeting on the 6th., day of January, 1912, for the purpose of discussing Senate Bill No. 109, which provides for the opening of the *diminished portion* of the Standing Rock Sioux Reservation * * * (Emphasis added).[24]

* * * There will be nothing but about 400 quarter sections left. That means nothing but bad lands scattered here and there. For that reason we do not like to have the *diminished portion* of our reservation opened at the present time. * * *

We are opposing the bill introduced by Senator Gamble to open the surplus lands within the *diminished portion* of the Standing Rock Reservation because the greater part of the lands we have already relinquished have not been entered yet by homesteaders and the lands are still subject to sale, and we desire that they be taken up by settlers before we consider any more openings. We do not want to have the surplus lands within the *diminished portion* opened, but we want them reserved as a permanent reserve to be used by the tribe for allotments from time to time to child births * * * (Emphasis added).[25]

* * * We do not see any reason at this time why the *diminished portion*

**23.** Letter from Inspector James McLaughlin to the Secretary of the Interior, December 16, 1911, reporting on conferences with the Indians of the Standing Rock Reservation with reference to the sale and disposition of the surplus lands of their reservation, as contemplated by S. 109, 62nd Cong., 1st Sess. (1911). The letter is reported in H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912) at 10.

**24.** Resolution of the Business Council of the Standing Rock Sioux Reservation, January 6, 1912, opposing S. 109.

**25.** Petition by a delegation of Indians from the Standing Rock Reservation to the Committee on Indian Affairs of the United States Senate and House of Representatives received by the Department of the Interior January 15, 1912, at 2.

of the reservation should be thrown open to settlement. * * *

* * * For that reason we do not like to have the *diminished portion* of our reservation opened at the present time. * * * (Emphasis added) [26]

* * * The Indians set forth that the unallotted lands of the *diminished reservation* are needed by them as communal grazing grounds and for allotments to children born after the closing of the allotment roll, and also that they have as yet received no income from the disposal of the surplus lands opened under the provisions of the act of May 29, 1908, supra. * *

* * * Notwithstanding the opposition to the opening of their reservation as expressed by the Indians in their council of November 28, 1911, I am of the opinion that the enactment of Senate bill 109, if amended as suggested herein, would be to the advantage of the Standing Rock tribe at large. (Emphasis added).[27]

Lastly, the Court notes the language contained in Section 2 of the 1908 Act.

* * * Provided, That prior to the said proclamation the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the area described in section one of this Act to relinquish such allotment and to receive in lieu thereof an allotment anywhere within the respective reservations thus *diminished* to which reservation the said Indians may belong * * * (Emphasis added).

A similar provision is not found in the 1913 Act simply because the Act opened the "balance" or remaining portion of the Reservation not affected by the 1908 Act. The Congress specifically provided protection for those Indians who had not

yet received their allotments in Section 2 of the 1913 Act. It is clear that the diminished reservation was not to be opened until these allotments had been made.

* * * Provided, That prior to said proclamation the Secretary of the Interior shall cause allotments to be made to every man, woman, and child belonging to or holding tribal relations in said reservation who have not heretofore received the allotments to which they are entitled under provisions of existing laws * * *.

Act of February 14, 1913, c. 54, Section 2, 37 Stat. 675. These and other provisions convince this Court that Congress understood that the 1908 Act diminished the exterior boundaries of the Standing Rock Reservation.

Mr. Fitzgerald. How much of the *former reservation* is undisposed of? (Reference is to that portion of the Reservation affected by the 1908 Act) (Emphasis added). 49 Cong.Rec. 1108 (1913).

The Court can discern no variance from that intent when S. 109 was enacted into law.

## SCHOOL LANDS

The 1913 Act contained a provision which was common to all the legislation affecting Indian reservations in South Dakota.

Sec. 7. That sections sixteen and thirty-six of the land in each township within the tract described in section one of this Act shall not be subject to entry, but shall be reserved for the use of the common schools and paid for by the United States at two dollars and fifty cents per acre, and the same are hereby granted to the States of South Dakota and North Dakota, respectively, * * *

---

26. Id. at 2.

27. Letter from the First Assistant Secretary of the Interior to the Hon. John H. Stephens, Chairman of the Committee on Indian Affairs, House of Representatives, April 30, 1912, reporting on S. 109, 62nd Cong., 1st Sess. (1911). The letter is reported in H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912) at 7.

Act of February 14, 1913, c. 54, Section 7, 37 Stat. 675. This provision was found to be a persuasive factor in the finding that the three acts affecting the Rosebud Reservation diminished the exterior boundaries of the Reservation. *Rosebud,* supra at 100–101. The legislative history of the 1913 Act demonstrates that Congress understood that this provision was in conformity with the act admitting North and South Dakota into the Union. Act of February 22, 1889, c. 180, 25 Stat. 676.

> Mr. Gamble. Mr. President, under the enabling act admitting into the Union the States of North Dakota, South Dakota, Montana, and Washington, *as has been frequently explained here,* it was provided that on the opening of any Indian reservation the title to sections 16 and 36 should then be transferred to the States for the benefit of the common schools. That is the obligation of the Government and the contract entered into in the enabling act; and since the admission of these States it has been the policy of the Government to pay the Indian tribes the price fixed for sections 16 and 36. As I have recited upon a former occasion, on the opening of the Sisseton Reservation, in the northeastern part of the State, $2.50 per acre was paid by the Government to the Indians for the cession of the lands in sections 16 and 36, and $3.50 was paid per acre on the opening of the Yankton Reservation in the same State. The same policy has been pursued in connection with the opening of Gregory County, a part of the Rosebud Reservation, for which $2.50 per acre was paid. The same is true as to lands in Tripp County, in the Rosebud Reservation, and in two bills already passed during the present session for the opening of other lands in the Rosebud Reservation and in the Pine Ridge Reservation the same policy has been pursued. * * *
>
> Mr. Gallinger. I did not quite understand the Senator in his statement concerning this reservation to the State. Where is that provided for?
>
> Mr. Gamble. In the enabling act, authorizing the admission of the States of North and South Dakota, Montana, and Washington.
>
> Mr. Gallinger. Providing that whenever an Indian reservation is opened certain sections shall be reserved—
>
> Mr. Gamble. That when title to an Indian reservation is *extinguished,* then, by direct conveyance, it went to the State, and the amount was to be paid by the Federal Government. It is an obligation of the Federal Government to the respective States. (Emphasis added).

\* \* \* \* \* \*

45 Cong.Rec. 5788 (1910). The Court concludes that Section 7 of the 1913 Act implemented the grant of school lands made in the enabling act. See *Rosebud,* supra at 101. Section 10 of the enabling act provided:

> \* \* \* That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time be subject to the grants * * * of this act, *nor shall any lands embraced in Indian,* military, or other reservations of any character *be subject to the grants * * * of this act until the reservation shall have been extinguished,* and such lands be restored to, and become a part of, the public domain. (Emphasis added).

Act of February 22, 1889, c. 180, 25 Stat. 676. The Court finds that by inclusion of the school land grant provision Congress manifested its intent to extinguish the Standing Rock Reservation in the 1913 Act.

### INTOXICANTS PROHIBITION

The 1913 Act specifically prohibited the introduction of intoxicants into the area affected by the Act.

> Sec. 8. That the lands allotted, those retained or reserved, and the surplus lands sold, set aside for town-site purposes, or granted to the State, or otherwise disposed of, shall be subject for

a period of twenty five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country.

This provision was included in the bill at the specific request of the Indians and upon recommendation of the Department of the Interior.[28] The provision was apparently placed in the bill without debate and as a matter of course. The Report from the Department of the Interior would indicate that the provision was in conformity with similar provisions contained in other bills affecting Indian reservations.

* * * The Department has found that a provision prohibiting the introduction of liquor into the territory *ceded* by Indians, for a period of twenty-five years, has been highly advantageous in suppressing the liquor traffic with the Indians. The Supreme Court in the case of *Dick vs. U. S.,* 208 U.S., page 340, [28 S.Ct. 399, 52 L.Ed. 520], upheld the validity of such a law. * * * (Emphasis added).[29]

A similar provision was discussed in *Rosebud,* supra at 112–113. In *Rosebud,* the Court found strong support in the intoxicants prohibition provision for its conclusion that the Act of May 30, 1910, c. 260, 36 Stat. 448, terminated the portion of the Rosebud Reservation in Mellette County. While the legislative history was much more explicit in *Rosebud* as to the effect of the intoxicants provision, the Court finds that Congress understood Section 8 of the 1913 Act to be a continuation of congressional policy followed on other reservations such as Rosebud.

---

28. See Proceedings of a Council with the Indians of the Standing Rock Agency, Standing Rock Reservation, January 8, 1910, at 10; H.R. Rep.No.637, 62nd Cong., 2d Sess. (1912) at 4.

29. Letter from the Secretary of the Interior to Moses E. Clapp, Chairman Committee on Indian Affairs, United States Senate, April 5, 1910. The letter is reported in S.Rep.No.217, 62nd Cong., 2d Sess. (1912) at 3. See also 45 Cong. Rec. 5788 (1910) (remarks of Mr. Gamble):

* * * Congress knew that various members of the Rosebud Sioux Tribe had taken allotments in the lands soon to be *ceded,* and these provisions attempted to continue to provide for those people in that area, *although the land would no longer be considered as reservation. * * ** (Emphasis added).

*Rosebud Sioux Tribe v. Kneip,* 375 F.Supp. 1065, 1081 (D.S.D.1974).

## CONCLUSION

The genesis of the 1913 Act is conclusively delineated by its legislative history and the circumstances then existing in the States of North and South Dakota. The Reservation was a barrier to the ever expanding need for land by white settlers. Congress was not oblivious to these circumstances.

* * * I ask the Senator from New Jersey not to impede the passage of this bill. It is a matter of the utmost importance to that region of the State. Between five and six million acres are held in the northwestern part of our State in these Indian reservations and extending through into North Dakota. It has impeded the development of the whole northwestern section of our State. Railroads have been extended west to the coast; branches are reaching out from the main line opening this vast region; and the defeat of this bill or to deny it consideration at this time is a hardship upon the State and especially of that section of it and its people. * * * *[30]

* * * I myself know how those Senators from that part of the country

---

* * * Section 8 (intoxicants prohibition) is recommended by the Department of the Interior in line with the decisions of the Supreme Court of the United States and in line with the policy followed in the opening of other reservations in South Dakota and other States.

30. 45 Cong.Rec. 5789 (1910) (remarks of Mr. Gamble).

feel about the settlement of these Indian reservations. They are, as it were, almost a barrier, arresting the progress and civilization of those sections; and I have long since believed that we have reached the time when the Indian must stand with this civilization of ours or else he must fall before it; and I am ready to destroy the local and peculiar character of that region and incorporate it into the body of the State, just as I assume these Indians by their allotments are to become citizens of the United States and of those states. * * * [31]

* * * The original treaty, made in 1889, contemplated that after the allotments had been made the surplus lands should be disposed of and sold to homestead settlers. The theory of the law was that it would be beneficial to the Indians in many respects to have the surplus lands settled upon and improved by the white people. * * * [32]

Do I understand the gentleman from Illinois (Mr. Foster) wants to keep these Indians forever in reservations? [33]

* * * The final solution of the Indian question is bound to be the intermingling of the white people and gradually swallowing up the Indian, and the only way you can do it is to have the land allotted to the individual Indians and let the white settler come in and buy the surplus lands. * * * [34]

In the opinion of your committee the surplus and unallotted lands are unnecessary for the use of the Indians,

and the opening of the reservation will result in a large increase in the settlement and development of that part of the State and will, to a very large extent, enhance the value of the holdings of the Indians. Your committee regards it as of the highest importance, not only to the Indians themselves but to the people of the State and to the General Government, that all the surplus and unallotted lands should be opened to settlement at the earliest practicable date. * * * [35]

The Indians were fully apprised and cognizant of the realities.[36] While there were objections raised by the Indians to certain provisions of the bill, most of these objections were met by way of amendment of the bill in accordance with the wishes of the Indians. Furthermore, the Indians were aware that Indian consent was no longer required in order for Congress to exercise its power with reference to opening the Reservation.

* * * but Congress has the power to enact such legislation without consulting the Indians. * * * Bear in mind that Congress has the power to open Indian reservations without consulting the Indians. * * * [37]

Although Congress has full power to enact legislation of this character without the consent of the Indians, it was felt the Indians should be fully advised as to the provisions of the pending measure and their views should be asked in regard thereto. * * * [38]

31. 48 Cong.Rec. 1482 (1912) (remarks of Mr. Bailey).

32. 48 Cong.Rec. 7560–7561 (1912) (remarks of Mr. Burke).

33. 49 Cong.Rec. 1107 (1913) (remarks of Mr. Burke).

34. 49 Cong.Rec. 1109 (1913) (remarks of Mr. Ferris).

35. S.Rep.No.517, 61st Cong., 2d Sess. (1910) at 2–3; S.Rep.No.590, 61st Cong., 2d Sess. (1910) at 2; S.Rep.No.217, 62nd Cong., 2d Sess.

(1912) at 1–2; H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912) at 4.

36. See generally Proceedings of a Council with the Indians of the Standing Rock Agency, Standing Rock Reservation, January 7, 1910, at 3.

37. Id. at 2–3.

38. S.Rep.No.517, 61st Cong., 2d Sess. (1910) at 4; S.Rep.No.590, 61st Cong., 2d Sess. (1910) at 3–4; S.Rep.No.217, 62nd Cong., 2d Sess. (1912) at 2; H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912) at 4.

The first bill introduced (S. 3284) which if enacted into law would have opened the eastern portion of the Reservation was contemporaneous with a series of acts affecting other reservations.[39] These acts have been held to have terminated reservation status.[40] In 1908 the western portion of the Reservation had been opened to settlement. It is apparent that the 1908 Act diminished the exterior boundaries of the Reservation.

> Section 11 of the bill is very objectionable to the Standing Rock Indians, as a similar provision in Senate bill 108, Sixty-second Congress, first session, is to the Cheyenne River Indians, which provides that the Secretary of the Interior shall cause not more than 20 per cent of the net proceeds arising from town lots hereafter sold under his supervision within the *former boundaries of the Standing Rock Indian Reservation, opened to settlement under the act of May 29, 1908,* to be set apart and expended under his direction in the construction * * *. (Emphasis added)[41]

There are repeated references in the Congress that the land area embraced within the boundaries of the Reservation after the 1908 Act is approximately 1,200,000 acres.

> * * * *As the opening of the entire reservation* is satisfactory to the Indian tribe, the bill has been amended to embrace that part of the reservation within the State of North Dakota. The area proposed to be opened is 1,131,280 acres. * * * (Emphasis added).[42]

> Mr. Gamble. It provides for the opening in North and South Dakota of all the remaining lands of the Standing Rock Indian Reservation. In South Dakota there are 748,800 acres and in North Dakota 564,480 acres.[43]

> Mr. Burke of South Dakota. Mr. Speaker, the Standing Rock Reservation contains about 1,300,000 acres of land. * * * *[44]

> Mr. Burke of South Dakota. * * * The reservation affected by this legislation contains 1,131,280 acres * * * *[45]

The references are added support for the proposition that Congress terminated that portion of the Reservation affected by the 1908 Act and that the 1913 Act would complete the process begun with the 1908 Act. See *Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87, 110–111 (8th Cir. 1975). The State of South Dakota prior to 1972 had exercised jurisdiction for a period of sixty years in the City of McLaughlin where the offenses allegedly occurred. Joint Brief for Defendants at 2. Subsequent enactments contained the reference "former" reservation.[46]

It is the holding of this Court that the Act of February 14, 1913, c. 54, 37 Stat. 675, terminated and returned to the public domain all unallotted land em-

---

**39.** See *Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87, 105 (8th Cir. 1975):

> * * * The 1907 Act was clearly presented to Congress generally as *one of a series of bills effecting the sale of Indian reservations,* * * * (Emphasis added).

**40.** See note 16 supra.

**41.** Letter from James McLaughlin to the Secretary of the Interior, December 16, 1911. The letter is reported in H.R.Rep.No.637, 62nd Cong., 2d Sess. (1912) at 1.

**42.** S.Rep.No.517, 61st Cong., 2d Sess. (1910) at 2; S.Rep.No.590, 61st Cong., 2d Sess. (1910) at 2; S.Rep.No.217, 62nd Cong., 2d Sess. (1912) at 1.

**43.** 45 Cong.Rec. 8244 (1910) (remarks of Mr. Gamble).

**44.** 48 Cong.Rec. 7560 (1912) (remarks of Mr. Burke).

**45.** 49 Cong.Rec. 1105 (1913) (remarks of Mr. Burke).

**46.** * * * That any homestead entryman or *purchaser of Government lands within the former* Cheyenne River and Standing Rock Indian Reservations in North Dakota and South Dakota * * *. Act of April 25, 1922, c. 140, 42 Stat. 499. See also Act of March 3, 1925, c. 464, 43 Stat. 1184; Act of March 31, 1928, c. 305, 45 Stat. 400.

braced within the eastern portion of the Standing Rock Indian Reservation. Plaintiff retained no jurisdiction over the offenses charged and defendants' motions to dismiss for lack of jurisdiction are granted. Counsel for the defendants are directed to prepare appropriate orders.